**Paul SAENGER, Plaintiff,**

v.

**MONTEFIORE MEDICAL CENTER, Defendant.**

Case No. 07–CV–488 (KMK).

United States District Court, S.D. New York.

March 31, 2010.

William David Frumkin, Esq., Elizabeth E. Hunter, Esq., Sapir & Frumkin LLP, White Plains, NY, for Plaintiff.

Richard Malcom Reice, Esq., Anjanette Cabrera, Esq., Seyfarth Shaw L.L.P., New York, NY, for Defendant.

### OPINION AND ORDER

KENNETH M. KARAS, District Judge:

This is an employment discrimination case. Dr. Paul Saenger, M.D. was accused by a staff person of physically assaulting her in a doorway, by his secretary of conduct so abusive that she had chest pains that caused her to go to a hospital, by several other women of sexual harassment and other inappropriate conduct, and by his superiors of ignoring patients and disobeying their directives. Dr. Saenger, however, is not the defendant in this action. Instead, he is the plaintiff claiming that his demotion and eventual termination in the wake of these (and other) allegations were the result of age discrimination and unlawful retaliation.

Plaintiff Dr. Paul Saenger, M.D. ("Plaintiff," or "Dr. Saenger") brings this suit against his former employer, Defendant Montefiore Medical Center ("Defendant," or "Montefiore"). He alleges discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, the New York State Human Rights Law ("NYSHRL"), New York Exec. Law § 296, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–107, as well as breach of contract.

Defendant now moves for summary judgment. For the following reasons, the Court grants Defendant's motion.

## I. Background

### A. Facts

Dr. Saenger is a recognized specialist in pediatric endocrinology. (Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. ("Def.'s Mem.") 1.) From January 1979 until May 2004, he was the chair of Montefiore's Pediatric Endocrinology Department. (Def.'s Local Civil R. 56.1 Statement of Undisputed Material Facts ("Def.'s 56.1") ¶ 1.) During that time, Dr. Saenger conducted research that enriched his field, maintained a clinical practice that cared for many patients, and obtained various lucrative grants for the hospital. (Def.'s Mem. 1; Pl.'s Statement Pursuant to Local R. 56.1 ("Pl.'s 56.1") ¶ 2.) In recognition of his achievement in the field, Dr. Saenger was chosen to serve as president of the 2009 World Congress of Pediatric Endocrinology. (Dep. of Paul Saenger, M.D., ("Saenger Dep.") 35.) Yet, on June 7, 2005, Dr. Saenger was fired. (Def.'s 56.1 ¶ 83.)

According to Defendant, the events giving rise to Dr. Saenger's termination began on July 1, 2002, when Dr. Gabriel Haddad was appointed Chair of Montefiore's Pediatric Department. (Id. ¶ 5.) Montefiore charged Dr. Haddad with reorganizing the Pediatric Endocrinology Department. (Id. ¶ 6.) At this time, Dr. Haddad was fifty-five years old. (Id. ¶ 7.) Early in his tenure as department chair, two staff members came to Dr. Haddad's office to inform him that Dr. Saenger had left the hospital to catch a flight, leaving patients waiting, and without rescheduling their appointments or providing coverage for their care. (Id. ¶ 10; Dep. of Gabriel Haddad, M.D. ("Haddad Dep.") 37–38.) While Dr. Saenger questions the accuracy and fairness of the report which Dr. Haddad received, he does not dispute that Dr.

Haddad received that report, or that it contributed to Dr. Haddad's first impression of Saenger. (Pl.'s 56.1 ¶ 10.)

On August 7, 2002, Dr. Saenger had a physical altercation with Susan Wesoly, his Physician Assistant. (Def.'s 56.1 ¶¶ 11–13.) According to Wesoly, she went to Dr. Saenger's office to discuss his treatment of her in connection with an assignment. (Id. ¶ 11; Def.'s Ex. F1.) Dr. Saenger was in a rush to get to the airport, but Ms. Wesoly refused to step aside, and demanded that Dr. Saenger meet with her immediately. Undeterred, Dr. Saenger allegedly grabbed Wesoly's arm and swung the door open, hitting Wesoly's lower back with the door handle. (Id. ¶ 12; Def.'s Ex. F–1.) At this point, Wesoly became hysterical and Dr. Saenger stormed out of the office. (Def.'s Ex. F–1.) This incident reportedly left a "bad[ ] bruise" on Wesoly's lower back. (Def.'s 56.1 ¶ 13; Def.'s Ex. F–1.) Dr. Saenger denies touching Ms. Wesoly—either with his hand or the door (Pl.'s 56.1 ¶ 12; Def.'s Ex. F–1), but he does not deny that Ms. Wesoly made this allegation to Defendant.

Defendant investigated this incident (which investigation included interviews of Wesoly and Dr. Saenger) and concluded that "it seems that there was no deliberate attempt to hit Susan Wesoly with the door." (Pl.'s 56.1 ¶¶ 14, 17; Def.'s Ex. F–2.) But, the investigation revealed larger problems with Dr. Saenger's behavior. Specifically, the hospital's risk manager noted that "[v]irtually all parties [who were interviewed] described Dr. Saenger's interaction with his staff as degrading and verbally abusive, particularly towards Lorraine Miller, his secretary whom he repeatedly humiliates in front of patients and staff." (Def.'s Ex. F–1.) "Consistent themes heard during the various interviews" with Dr. Saenger's staff were "dictatorial, bullyish, arrogant, insensitive, belittling, mean, demeaning, [and] temper-

amental." (Def.'s Ex. F–2.) After this incident, Defendant ordered Dr. Saenger to undergo a fitness for duty examination and anger management. (Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.) The examination showed that Saenger was fit for duty and the anger management program was discontinued after a few sessions. (Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.)

The next complaint about Dr. Saenger came from Loraine Miller, his long-time secretary, in the spring of 2003. (Def.'s 56.1 ¶¶ 20–21; Pl.'s 56.1 ¶¶ 20–21.) Ms. Miller complained that Dr. Saenger became verbally explosive towards her and that she was so distraught that she experienced chest pains and needed to check herself into a hospital for several days. (Def.'s 56.1 ¶¶ 21–22.) Again, Dr. Saenger disputes the truth of these allegations, but not that they were made to Defendant. (Pl.'s 56.1 ¶¶ 21–22.) Upon Ms. Miller's return to work, Dr. Haddad and Dr. Phillip Ozuah, Vice Chairman for Clinical Affairs, informed Dr. Saenger that, because of his inappropriate treatment of Ms. Miller and the rest of his staff, his office was being moved out of the Pediatric Endocrinology Department. (Def.'s 56.1 ¶¶ 23–24.) Dr. Saenger was still chief of the department, but he was not allowed to have any direct contract with Ms. Miller, nor was he permitted to visit the Wayne Avenue office, where the rest of the Pediatric Endocrinology Department was located, between the hours of 7:00 a.m. and 7:00 p.m. (*Id.*)

Dr. Haddad also wrote Dr. Saenger a letter, dated May 19, 2003, informing him that because of "several complaints by [his] staff," the hospital was placing him on "strict probation for the next twelve months." (Def.'s Ex. D–1.) Dr. Haddad warned Dr. Saenger that "[a]ny inappropriate verbal outbursts [or] inappropriate verbal displays of anger and frustration . . . will not be tolerated and will lead to prompt disciplinary action, which may include your immediate dismissal." (*Id.*) The letter was clear that this was Dr. Saenger's "final opportunity to remain in Montefiore's employ." (*Id.*)

On June 27, 2003, Dr. Ozuah sent Dr. Saenger another letter because Dr. Saenger had expressed concern that he was receiving "mixed messages" regarding whether he was allowed to contact Ms. Miller and his former office. (Def.'s Ex. H–1; Pl.'s 56.1 ¶ 25.) The letter instructed Dr. Saenger to "use *only* the following telephone number to contact the Endocrine office," a number Ms. Miller was told not to answer. (Def.'s Ex. H–1 (emphasis in original).) The letter stated that it should be considered a clarification of Dr. Haddad's May 19, 2003 letter. (*Id.*) Dr. Saenger replied, asking for "further clarification." (*Id.*) Frustrated, Dr. Ozuah insisted that "*No* further clarification is needed! My memo is *clear* and unambiguous." (*Id.* (emphasis in original).) Despite this exchange, Dr. Ozuah continued to receive complaints that Dr. Saenger violated this instruction. (Def.'s 56.1 ¶ 33.) In fact, members of the Pediatric Endocrinology Department threatened to call the state department of health to file complaints about Dr. Saenger. (Def.'s 56.1 ¶ 34; Dep. of Brian Currie, M.D. ("Currie Dep.") 115–16.)

In March 2004, Dr. Saenger clashed with his superiors at Montefiore over the Pediatric Department's evaluation by the Accreditation Council for Graduate Medical Education ("ACGME"). The ACGME review occurs every three to five years and is taken very seriously because a poor evaluation could cost Montefiore its accreditation. (Def.'s 56.1 ¶¶ 35–36.) At a meeting with all the section chiefs, including Dr. Saenger, Dr. Haddad announced that Dr. Ozuah was in charge of coordinating the review because Dr. Haddad was concerned about how previous reviews

were conducted. (*Id.* ¶ 37.) Dr. Haddad instructed the division chiefs that all communication with ACGME must go through Dr. Ozuah. (Pl.'s 56.1 ¶ 38.)

On March 3, 2004, Dr. Saenger ignored this instruction by contacting ACGME, without Dr. Ozuah's permission, to change the date of the review of the pediatric endocrinology division. (Def.'s 56.1 ¶ 39.) When Dr. Ozuah confronted Dr. Saenger about the matter, Dr. Saenger admitted that he contacted ACGME and stated that he had every intention of contacting them again. (*Id.* ¶ 40.) Dr. Saenger did not consider this act of insubordination to be "serious,"—and apparently still does not consider it serious—"because [Dr. Saenger] himself had successfully engaged in the review process for many years." (Pl.'s 56.1 ¶ 40.) A verbal altercation between Drs. Saenger and Ozuah ensued in which Dr. Ozuah asked Dr. Saenger, "why are you fucking with me?" (Def.'s 56.1 ¶ 41.) Both parties reported this incident to Dr. Haddad. (*Id.* ¶ 42.) While Dr. Saenger was very upset about the incident and demanded an apology, at no point did he attribute the incident to age discrimination. (*Id.* ¶ 43.) Indeed, to this day, Dr. Saenger has "no belief, one way or the other" as to whether this incident was related to his age. (Saenger Dep. 96.)[1]

On March 15, 2004, Dr. Ozuah sent Dr. Saenger a letter regarding Dr. Saenger's unauthorized change of dates with the ACGME. (*Id.* ¶ 44.) Dr. Ozuah instructed Dr. Saenger to submit a written explanation and plan for corrective action by March 17. (*Id.* ¶ 44.) Dr. Saenger failed to do so. (*Id.* ¶ 45.) Dr. Saenger explained that "comply[ing] fully ... turned out to be impossible," first because Dr.

Saenger was unable to reach "certain people with whom [he] had come to a mutual understanding," and then because Dr. Saenger was placed on involuntary leave on March 24. (Pl.'s 56.1 ¶ 45.)

At the same time that Dr. Ozuah was responding to Dr. Saenger's insubordination regarding ACGME, other hospital administrators were faced with unrelated, but far more serious, allegations against Dr. Saenger. On March 15, 2004, Dr. Marian Larkin, a resident at Montefiore, reported to Dr. Cathy Skae, the Residency Program Director, that Dr. Saenger touched her inappropriately twice on the breast and buttocks during a Diabetes Clinic. (Def.'s 56.1 ¶ 46.) On or about March 24, 2004, Dr. Saenger was placed on leave while the hospital investigated Dr. Larkin's complaint. (*Id.* ¶ 48.)

Before the investigation began, Dr. Brian Currie, who was the medical director at Montefiore (Currie Dep. 30), told Dr. Saenger that somebody had made a "very serious accusation about his personal behavior," that this alleged accusation could have "state reportability consequences," and that the hospital was "taking it very seriously." (*Id.* at 120.) Dr. Currie further explained that there would be a "thorough review" of the allegation and that Dr. Saenger would get a "fair review." (*Id.*) Dr. Currie also told Dr. Saenger that he thought it advisable that Dr. Saenger take a voluntary leave with pay. (*Id.*) According to Dr. Currie, he took this approach to allow for an expeditious investigation to avoid any further reporting obligations. (*Id.*) Dr. Saenger, according to Dr. Currie, agreed to this procedure. (*Id.*)[2]

A week later, on April 1, 2004, Dr. Saenger's lawyer sent a letter to Defendant

---

1. As noted below, Dr. Saenger does complain that this incident was not investigated and that no one ever spoke to him about it. (Pl.'s 56.1 ¶ 102(a).) Accordingly, while Dr. Saenger does not allege that the incident itself was

related to his age, he asserts that Dr. Haddad's refusal to investigate it was. (Saenger Dep. ¶ 140.)

2. Dr. Saenger notes that Dr. Currie did not tell Dr. Saenger that the allegations involved

alleging that "Dr. Saenger's age (62) may have been a motivating factor in the determination to place him out on administrative leave (which we believe will likely result in his termination)." (Def.'s Ex. D–7.) The letter also noted that counsel had informed Dr. Saenger of his right to sue under the ADEA should the investigation of him result in termination or other adverse employment action. (*Id.*) Counsel suggested that such a suit would result in "a protracted public proceeding which will be distracting, time consuming, and costly." (*Id.*)

It was apparently difficult to fully substantiate the alleged incidents between Drs. Saenger and Larkin. This was perhaps because both incidents allegedly occurred in the presence of third parties but were done subtly enough to escape notice. (Def.'s Ex. 2.) Moreover, beside looking down and crossing her arms, Dr. Larkin did not immediately and noticeably react to the alleged gropings. (*Id.*) Still, the hospital's interviews with Dr. Saenger's other female co-workers proved eye-opening. Dr. Stein stated that Dr. Saenger did not have "good boundaries," and recounted an incident in which she believed that he had "deliberately reached for her breast," and would have succeeded had she not moved away. (Def.'s Ex. D–2.) Mary Ellen Watson implied that incidents had occurred in the past but indicated that she did not want to make an official complaint because she had "handled" Dr. Saenger in the past and, presumably, was confident in her ability to do so in the future. (*Id.*) Watson did state that Dr. Saenger had never "ogled" her. (*Id.*) Dr. Rich reported that Dr. Saenger often made physical con-

tact with her that was inappropriate for a professional setting by, for example, standing "inappropriately close" during conversation and putting his arm on her shoulders. (*Id.*) Consequently, she said that she "mildly dreads" interacting with him. (*Id.*) But, while she believes that Dr. Saenger has a reputation of being "lecherous," she admitted that she had never witnessed him touch others in a sexually offensive manner. (*Id.*) Besides Dr. Larkin, none of these women wanted the hospital to pursue sexual harassment charges against Dr. Saenger. (Def.'s 56.1 ¶ 57; Haddad Dep. 142, 146–47; Ozuah Dep. 97.)

To be sure, not all of the women who were interviewed painted such a negative picture of Dr. Saenger. Joanne Aranoff described Saenger as a "touchy" person, who puts his arms around others in a friendly, but not inappropriate, manner. (*Id.*) Dr. Vuguin concurred, acknowledging Dr. Saenger's touchy demeanor but finding it not inappropriate. (*Id.*) Dr. Skae said that, while she is aware that Dr. Saenger has a reputation for staring at women, he has never "ogled" her. (*Id.*) Likewise, Dr. Dattner reported that Dr. Saenger had never acted inappropriately towards her. (*Id.*)

On May 11, 2004, Dr. Currie met with Dr. Saenger. (Saenger Dep. 123; Reice Ex. D–6.) During this meeting, Dr. Currie told Dr. Saenger about the sexual harassment allegations and asked him to provide his version of the events. (Currie Dep. 128–29.) Dr. Saenger, who claims that this meeting was the first time he was informed that any such allegations had been made against him, denied that the allegations were true. (Currie Dep. 129.) [3]

---

sexual harassment, or who made the allegations. (Pl.'s 56.1 ¶ 48.) Dr. Currie did this because of his concern about Dr. Saenger's "past behavioral issues," which led Dr. Currie to believe that Dr. Saenger "would not be able to resist trying to confront his accuser or

to try to get additional information." (Currie Dep. 121–22.)

**3.** In his Rule 56.1 Statement, Dr. Saenger also claims that Dr. Currie reported that the investigation did not turn up anything "sub-

While Dr. Currie did not believe Plaintiff, based on the plethora of other complaints against Dr. Saenger, he felt hamstrung by the reluctance of some of the complainants to bring formal charges against Dr. Saenger (which reluctance was in part a result of the perception that Montefiore had tolerated inappropriate conduct by Dr. Saenger on previous occasions), and the concerns raised by legal counsel in light of the letter the hospital received from Dr. Saenger's attorney. (Currie Dep. 127, 129–30.)

So, on May 17, 2004, the hospital formally informed Dr. Saenger of the complaint against him, and noted that an investigation "revealed a pattern of inappropriate and unprofessional conduct towards women." (Def.'s Ex. D–6.) The letter told Dr. Saenger that he was allowed to return to work, but warned that "similar unprofessional behavior" would render him "subject to termination." (*Id.*) Upon returning to work, on May 21, 2004, Dr. Haddad informed Dr. Saenger that he was being removed from his position as Chief of the Pediatric Endocrinology Department because of the continuing series of complaints against him. (Def.'s 56.1 ¶ 63.) Dr. Saenger, then sixty-two, was replaced as Chief by Dr. Joan DiMartino–Nardi, then fifty. (*Id.* ¶ 64; Def.'s Ex. J.) At the time of her promotion, Dr. DiMartino–Nardi was the most senior person in the Pediatric Endocrinology Department. (Def.'s 56.1 ¶ 64.) She was originally hired by Dr. Saenger himself, presumably because he deemed her skilled and capable. (*Id.*)

In November 2004, Beena Mangra, Dr. Saenger's secretary, became the latest of Dr. Saenger's subordinates to complain about his allegedly rude and unprofessional behavior. (*Id.* ¶ 69; Def.'s Ex. D–8.) Examples of the impolite comments cited by Ms. Mangra include the following:

- Mangra: "I would like to schedule a meeting with you to discuss how we can work together." Saenger: "The world does not revolve around you."

- Mangra: "I cannot go to the house today to remove the messages on the answering machine because I am the only one in the office to answer the phone." Saenger: "So what, you went out to lunch."

- Saenger: "If all [you] can do is file and pull charts then [you] should have let [me] know that when [I] hired [you]." (Def.'s Ex. D–8.)

On December 16, 2004, Dr. DiMartino–Nardi informed Dr. Saenger that, as of January 2005, he was to assume certain responsibilities at Jacobi Medical Center, including attending sessions at the Jacobi Pediatric Endocrine Clinic and being on-call. (Def.'s 56.1 ¶ 71.) Dr. Saenger contested the assignment, insisting that "this exceeds my capacity, considering that I already see patients on four days." (Pl.'s 56.1 ¶ 72.) Dr. Saenger explained that he had a number of new "sponsored, funded trials" which "make it impossible to take this on for the entire year." (*Id.*) Dr.

stantive" about any improper conduct by Dr. Saenger. (Pl.'s 56.1 ¶ 53.) However, the cite for this assertion is Dr. Saenger's own deposition, which actually says that Dr. Currie merely told Dr. Saenger that he would be allowed to return to work because the sexual harassment claims could not be established. (Saenger Dep. 123.) This is not inconsistent with Dr. Currie's view that the sexual harassment allegations were truthful, but that because of the reluctance of the victims to bring formal charges, Montefiore could not formally charge Dr. Saenger with such misconduct. Indeed, it would make little sense for Dr. Currie to supposedly tell Dr. Saenger that there was nothing "substantive" to the charges (a word, again, that does not even appear in Dr. Saenger's deposition) on May 11, but then tell him in writing on May 17, that the investigation "revealed a pattern of inappropriate and unprofessional conduct toward women." (Reice Ex. D–6.)

Saenger offered to "do it for several months of the year," and stated that he would be "glad to discuss [the matter] with" Dr. DiMartino–Nardi. (*Id.*) The next day, December 17, Dr. DiMartino–Nardi responded, asking for a schedule and a projected time commitment for Dr. Saenger's trials. (Def.'s Ex. D–9.) Dr. Saenger sent the schedule, but Dr. DiMartino–Nardi asked again for projected time commitments. (*Id.*) Dr. Saenger replied on December 21, promising to let Dr. DiMartino–Nardi know the next day. (*Id.*) The two did not have any further contact until after Dr. Saenger missed his first scheduled session at Jacobi on January 3, 2005. (*Id.*) Dr. Saenger did not report to Jacobi because "he had things scheduled on that date and had only been given two weeks' notice." (Pl.'s 56.1 ¶ 73.)

In February or March 2005, Dr. Haddad began to discuss terminating Dr. Saenger's employment with hospital executives and attorneys, including the Dean of the Medical School, and Drs. Currie and Conaty. (Def.'s 56.1 ¶¶ 76, 78; Pl.'s 56.1 ¶ 76.) At some point before April 2005, Dr. Haddad decided to fire Dr. Saenger (Def.'s 56.1 ¶ 78), but Dr. Haddad did not notify Dr. Saenger of this decision until June 2005 because Drs. Haddad and Saenger had to prepare for and attend some professional conferences in April and May. (Pl.'s 56.1 ¶ 77.)

Dr. Haddad decided that Dr. Saenger's termination would not be "for cause" (Def.'s 56.1 ¶ 79), a fact that Plaintiff greatly emphasizes in opposing summary judgment. (Pl.'s Mem. 19–20.) Dr. Haddad testified that he did not terminate Dr. Saenger for cause because (1) Dr. Saenger

was being terminated for interpersonal issues, not for professional incompetence; (2) Dr. Haddad did not wish to unduly harm Dr. Saenger's career; and (3) "for cause" termination would require Dr. Saenger to leave immediately, rather than receive the choice of one year notice or six months' of severance pay. (Def.'s 56.1 ¶¶ 79–80.) [4]

On June 7, 2005, Dr. Haddad notified Dr. Saenger of his termination. (*Id.* ¶ 83.) Pursuant to Montefiore's established policy when terminating physicians for reasons other than cause, Dr. Saenger was given the option of a notice period of twelve months or severance pay equal to six months' salary. (*Id.*) Dr. Saenger chose the notice period. (*Id.* ¶ 84.) Dr. Saenger later petitioned Dr. Ozuah (who became Chair of Pediatrics in August 2005 after Dr. Haddad's departure) to allow him to retain his faculty appointment at Montefiore's affiliated medical school. (*Id.* ¶ 92.) Dr. Saenger said that without the appointment he risked losing some of his national projects. (*Id.*) Dr. Ozuah obliged, and also approved Dr. Saenger's application for admitting privileges at Montefiore. (*Id.* ¶¶ 93, 94.)

Dr. Haddad ultimately decided to terminate Dr. Saenger because of the "behavioral and attitudinal issues" recounted above that took place "over the previous three years." (Haddad Dep. 192.) Plaintiff, of course, disputes this and alleges that Haddad terminated him "at least in part due to [Plaintiff's] age." (Pl.'s 56.1 ¶ 78.) Plaintiff seeks to prove this at trial by relying on the following: (1) the fact that Plaintiff's replacement was younger and less experienced; (2) the timing of, and alleg-

4. At his deposition, Dr. Haddad initially declined to say why Dr. Saenger was not fired for cause, telling Plaintiff's counsel: "[D]on't ask me these questions. You have to ask the rules and regulations and the hospital lawyers." (Haddad Dep. 193.) He then declared that the hospital rules would not allow a "for

cause" dismissal, responding tersely to Plaintiff's counsel's inquiry: "This was the rule. This was the regulation." (*Id.*) When asked what sort of things *would* justify termination for cause, Dr. Haddad said that it must be "major things" like "leaving a huge instrument inside [a patient's] belly." (*Id.* at 194.)

edly inconsistent reasons given for, Plaintiff's termination; (3) Defendant's supposed preferential treatment of younger employees; (4) Defendant's purported pattern of dismissing older employees in favor of younger ones; and (5) two inaccuracies in the employment records which Defendant submitted to the Court.

### B. Procedural History

Plaintiff filed the Complaint on January 22, 2007. (Dkt. No. 1.) Defendant answered on March 16, 2007. (Dkt. No. 5.) After completing discovery, Defendant moved for summary judgment on April 17, 2009. (Dkt. No. 33.) On February 25, 2010, the Court held oral argument on this motion.

### II. Discussion

### A. Standard of Review

Summary judgment may be granted where it is shown "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (same). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir.2003); *see also Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir.2006) (noting that a court must draw all reasonable inferences in the nonmovant's favor).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir.2005). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir.2008) (internal citations omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). "A fact is 'material' when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir.2007) (internal quotation marks omitted). At summary judgment, a court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F.Supp. 1205, 1212 (S.D.N.Y.1990). A court's goal should be "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548.

"A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citations omitted). Indeed, "[b]ecause writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* Still, it is "be-

yond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001). In fact, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985). Thus, the Supreme Court has "reiterated that trial courts should not treat discrimination differently from other ultimate questions of fact." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotation marks omitted).

### B. Analysis

#### 1. Age Discrimination Claim

##### a. Framework

■ Plaintiff alleges age discrimination under the ADEA, the NYSHRL, and the NYCHRL. The ADEA makes it "unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[5] The Supreme Court recently has held that "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." *Gross v. FBL Fin. Servs., Inc.*, —— U.S. ——, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009). Thus, "[t]o establish a disparate-treatment claim under the plain language of the ADEA, ... a plaintiff must prove that age was the 'but-for' cause of the employer's adverse action." *Id.* This replaced the pre-*Gross* rule under which plaintiffs had to establish that age was *a*

motivating factor in adverse employment actions. *See, e.g., Holtz v. Rockefeller & Co.*, 258 F.3d 62, 76 (2d Cir.2001).

■ Because *Gross* dealt only with the ADEA, it is an open question whether a plaintiff alleging age discrimination under the NYSHRL and the NYCHRL must establish "but-for" causation. On the one hand, the Supreme Court's analysis in *Gross* directly flowed from the ADEA's language, and, in particular, how that language differed from the language of Title VII, as amended in 1991. On the other, the Second Circuit has continued to note, post-*Gross*, that "[a]ge discrimination claims brought pursuant to the NYSHRL and the NYCHRL are analyzed under the ADEA framework." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 n. 1 (2d Cir.2009) (citing *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 114 n. 3 (2d Cir.2007)). In at least two post-*Gross* age discrimination cases, the Second Circuit has declined to explicitly address this issue. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 n. 6 (2d Cir.2010) ("[W]e assume, without deciding, that the Supreme Court's *Gross* decision affects the scope of the NYHRL law as well as the ADEA."); *Leibowitz*, 584 F.3d at 506 (reversing summary judgment on ADEA, NYSHRL, and NYCHRL claims because a "rational finder of fact could decide that defendants' proffered reasons ... [were] intended to mask unlawful discriminatory intent" without explicitly noting which standard of causation applied to the state and city claims).

■ At least for NYCHRL claims, there is a strong basis for applying the less-demanding "mixed-motive" standard, whereby a plaintiff need only show that age was "*a* motivating factor." Indeed, relying principally on the Local Civil

---

**5.** This prohibition is "limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a).

Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005) (the "Restoration Act"), Judge Cote recently found that *Gross* did not alter the mixed-motive paradigm under the NYCHRL. *See Weiss v. JPMorgan Chase & Co.*, No 06–CV–4402, 2010 WL 114248, at *3–4 (S.D.N.Y. Jan. 13, 2010). In particular, Judge Cote noted that the Restoration Act amended the construction provision of the NYCHRL to require that it be "construed liberally ... regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed." Restoration Act § 7. As a result of the Restoration Act, the Second Circuit has instructed that a court "must view[ ] similarly worded provisions of federal and state civil rights laws as a *floor* below which the [NYCHRL] cannot fall." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir.2009) (emphasis in original) (internal quotation marks omitted). Moreover, unlike in federal law, there is no distinction in the language of the NYCHRL that justifies treating age discrimination differently than race or gender discrimination; it proscribes all in one provision. Thus, to apply *Gross* to the NYCHRL, as Judge Cote noted, would provide "*less* protection against other types of discrimination, such as that based on race, gender, or religion, than is currently provided by Title VII," a result directly contrary to the Restoration Act and Second Circuit precedent. *Weiss*, 2010 WL 114248, at *3.

The case for applying the mix-motive test in NYSHRL cases is arguably weaker

because the NYSHRL does not have the same history of liberal construction. *See Brown v. Cushman & Wakefield, Inc.*, 01–CV–6637, 2002 WL 1751269, at *22 n. 38 (S.D.N.Y. July 29, 2002) (Peck, M.J.) ("[T]he 'legislative history' of the NYCHRL makes clear that it is to be even more liberally construed than the federal and *state* antidiscrimination laws.") (emphasis added) (internal quotation marks omitted), *adopted*, 235 F.Supp.2d 291 (S.D.N.Y.2002); *Hanna v. N.Y. Hotel Trades Council*, 18 Misc.3d 436, 851 N.Y.S.2d 818, 822 n. 1 (Sup.Ct.2007) ("NYCHRL is to be liberally and independently construed with the aim of making it more protective than its federal ... *or state* ... counterparts.") (emphasis added); *cf.* Restoration Act § 7 (requiring that the NYCHRL be "construed liberally ... regardless of whether federal or *New York State* civil and human rights laws ... have been so construed." (emphasis added)). The Court need not decide which causation standard applies to age discrimination claims under the NYSHRL and the NYCHRL, however, because it finds that no reasonable jury could conclude that age was a motivating factor in Defendant's decision to terminate Plaintiff, let alone the but-for cause of that decision.

 ADEA cases, like those brought under Title VII, are analyzed under the burden-shifting model set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Abdu–Brisson*, 239 F.3d at 466; *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir.2000).[6] Under the *McDonnell Douglas* framework, the plaintiff carries

---

6. Just last month, the Second Circuit held that while "*Gross* changes the latter part of [the *McDonnell Douglas*] formulation by eliminating the mixed-motive analysis ..., [it] did not ... reject the *McDonnell Douglas* burden-shifting framework for ADEA cases altogether." *Gorzynski*, 596 F.3d at 106–07 (internal citations omitted). Thus, the Second

Circuit has concluded that courts remain bound by, and have "no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit." *Id.* It follows *a fortiori* that there is no reason to jettison the burden-shifting framework for NYSHRL and NYCHRL

the initial burden of proving a prima facie case of discrimination. *Abdu–Brisson,* 239 F.3d at 466. To establish a prima facie case, a plaintiff must show that (1) he was a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Id.* The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 468. The burden at this stage is one of production, not persuasion. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Once the defendant meets this burden, the presumption of discrimination "drops out of the picture." *Id.* at 510–11, 113 S.Ct. 2742. The burden then shifts back to the plaintiff to present sufficient evidence to permit a rational finder of fact to infer that the defendant's proffered reason is a pretext and that "age was the 'but-for' cause of the challenged adverse employment action," *Gross,* 129 S.Ct. at 2352, or perhaps for the state and city law claims, only that "the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ. in the City of N.Y.,* 131 F.3d 305, 312 (2d Cir.1997).

### b. Application

■ Dr. Saenger has established a prima facie case. First, during the relevant time period, he was well over the age of forty. *See* 29 U.S.C. § 631(a) (defining the class protected by the ADEA as "individuals who are at least 40 years of age"). Second, there does not seem to be serious dispute that Dr. Saenger was qualified for his position. (*See* Def.'s Mem. 1.)[7] Third, Dr. Saenger suffered adverse employment action when he was demoted and terminated.

■ Finally, "[t]he fourth element of a prima facie case is typically satisfied if the plaintiff is replaced by an individual outside of his protected class." *Adia v. MTA Long Island R.R.,* No. 02–CV–6140, 2006 WL 2092482, at *7 (E.D.N.Y. July 26, 2006) (citing, inter alia, *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). In age discrimination suits, courts look to whether the replacement is "substantially younger" than the plaintiff, not simply to whether the replacement was under forty. *See O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) ("[T]he fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.") Here, the fourth element is established because Dr. Saenger was replaced by Dr. DiMartino–Nardi, who is twelve years younger than he is. (Def.'s 56.1 ¶ 64; Def.'s Ex. J.); *see Brooks v. Leake & Watts Org., Inc.,* No. 02–CV–9865, 2005 WL 1875772, at *8

claims. *See Leibowitz,* 584 F.3d at 498 n. 1 ("Age discrimination claims brought pursuant to the NYSHRL and the NYCHRL are analyzed under the ADEA framework ...." (internal citations omitted)); *Boyle v. HSBC Bank, USA, Inc.,* No. 08–CV–11358, 2010 WL 235001, at *4 & n. 53 (S.D.N.Y. Jan. 19, 2010) (applying *McDonnell Douglas* to age discrimination claims under the NYSHRL and the NYCHRL).

7. While one can argue that a talented professional is nonetheless not "qualified" for a job if he habitually conducts himself in an unprofessional manner, the Second Circuit has made clear that such misconduct is more appropriately considered at the second and third stages of the *McDonnell Douglas* framework. *See Owens v. N.Y. City Hous. Auth.,* 934 F.2d 405, 409 (2d Cir.1991) ("An individual may well have the ability to perform job duties, even if her conduct on the job is inappropriate or offensive.").

(S.D.N.Y. Aug. 2, 2005) ("[T]hat [the employee hired instead of plaintiff] was approximately ten years younger than [plaintiff] is sufficient to meet the minimal burden plaintiff carries to show a prima facie case of discrimination.").[8]

■ The burden thus shifts to Defendant to articulate a legitimate, nondiscriminatory reason for demoting and eventually terminating Dr. Saenger. This burden is one of production only, and is not a heavy one. *See Adia,* 2006 WL 2092482, at *8 (noting the " 'low threshold' that the defendant must meet" in providing a legitimate nondiscriminatory reason for plaintiff's termination) (quoting *Gorley v. Metro–N. Commuter R.R.,* No. 99–CV–3240, 2000 WL 1876909, at *6 (S.D.N.Y. Dec. 22, 2000)). Defendant cites Plaintiff's unprofessional conduct and poor attitude as the legitimate, nondiscriminatory reason for his termination. (Def.'s 56.1 ¶ 78; Haddad Dep. 192–93.) The multiple, independent, and documented accusations of unprofessional conduct that were made against Plaintiff to Defendant adequately support Defendant's stated rationale. *See Owens v. N.Y. City Hous. Auth.,* 934 F.2d 405, 407, 409 (2d Cir.1991) ("We have no doubt that such misconduct [being disrespectful, insubordinate, and abusive] may certainly provide a legitimate and nondiscriminatory reason to terminate an employee."); *Revere v. Bloomingdale's, Inc.,* No. 03–CV–5043, 2006 WL 3314633, *8 (E.D.N.Y. Nov. 14, 2006) ("[Defendant] has produced a detailed record of Plaintiff's performance deficiencies leading up to Plaintiff's discharge and has, therefore, met its burden [of articulating a legitimate, non-discriminatory reason for firing Plaintiff].").

■ The burden, then, falls back to Plaintiff to present sufficient evidence to permit a rational finder of fact to infer that Defendant's proffered concerns with Plaintiff's attitude and professionalism were a pretext and that Plaintiff's firing was either the result of age discrimination (under the ADEA), or "more likely than not based in whole or in part on [age] discrimination," (under the NYSHRL and the NYCHRL, if these statutes are so interpreted). *See Stern,* 131 F.3d at 312. Plaintiff has failed to meet either burden.

Defendant has documented a series of complaints against Plaintiff, spanning over the course of three years and coming from a variety of sources. It is not for the Court to decide whether these complaints were truthful or fair, as long as they were made in good faith. *See Adia,* 2006 WL 2092482, at *9 (noting that "when an employer relies on information in good faith in making an employment decision, there is no statutory violation," even if defendant's information is "incorrect"); *Gorley,* 2000 WL 1876909, at *7 (noting that "even if plaintiff could prove" that defendant erred in concluding that plaintiff had misappropriated funds, defendant's "dismissal of plaintiff would not violate" the law, so long as "defendant relied upon the information in good faith"); *cf. Revere,* 2006

---

**8.** The Second Circuit has held that "where a plaintiff relies on a substantial age discrepancy between herself and her replacement, she must adduce some evidence indicating defendants' knowledge as to that discrepancy." *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 82–83 (2d Cir.2005). "[W]here such knowledge is undisputed," however, "a court need not specifically address this point; rather it may be assumed." *Id.* at 83. Here, Defendant has not disputed that it was aware of Dr. Saenger's and Dr. DiMartino–Nardi's age. Accordingly, the Court assumes that it was aware. This assumption is rational because both Dr. Saenger and Dr. DiMartino–Nardi were long-term Montefiore employees and Defendant had records of their dates of birth. (Def.'s Ex. J); *Brooks,* 2005 WL 1875772, at *8 n. 3 (assuming that Defendant knew the ages of the relevant actors because "both men were already in defendant's employ at the time" and "personnel records were kept").

WL 3314633, at *8 ("Plaintiff may not establish pretext by rationalizing her errors or by blaming others.").

Nor may the Court decide whether the complaints, if true, justify Plaintiff's termination, because "the ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age." *Norton v. Sam's Club,* 145 F.3d 114, 120 (2d Cir.1998); *see also Brooks,* 2005 WL 1875772, at *8 ("[T]he task here is not an objective assessment of whether [Defendant] erred in choosing [to take adverse employment action against Plaintiff].... "); *Gambello v. Time Warner Commc'ns, Inc.,* 186 F.Supp.2d 209, 224 (E.D.N.Y.2002) ("Plaintiff's fundamental disagreement with the conclusions his supervisors drew from incidents which he admits occurred ... is not evidence that his supervisors' appraisals were a sham, invented to mask discrimination." (quotation marks and brackets omitted)). Put simply, "this Court does not sit as a super-personnel department that reexamines an entity's business decisions." *Scaria v. Rubin,* 117 F.3d 652, 655 (2d Cir.1997) (internal quotation marks omitted). Thus, whether the complaints against Plaintiff were truthful, and whether, if true, they justify termination, are immaterial disputes.

The Court must ask whether anything about Plaintiff's termination "undermine[s] the credibility of [Defendant's] stated justification." *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 103 (2d Cir.2001). The Court finds no such evidence. Plaintiff does not dispute that eight Montefiore employees—everyone from Plaintiff's secretary to the Chair of the Pediatrics Department—complained to Defendant about Plaintiff's attitude and professionalism. Nor does Plaintiff dispute that several other employees expressed similar concerns during Defen-

dant's investigations of Plaintiff's alleged misconduct. Plaintiff does not claim that these employee complaints were somehow orchestrated by Defendant as part of a conspiracy to justify firing Plaintiff, let alone part of a conspiracy to discriminate on the basis of Plaintiff's age. *See Revere,* 2006 WL 3314633, at *8 (noting plaintiff's failure, in the face of "documented deficiencies in her job performance," to "present any evidence that supports the existence of a discriminatory agenda towards older workers"); *Cadet v. Long Island Coll. Hosp.,* No. 97–CV–1905, 1999 U.S. Dist. LEXIS 23582, at *39 (E.D.N.Y. July 9, 1999) ("[P]laintiff's long disciplinary record of warnings issued by over ten different supervisors ... illustrates the weakness of any pretext argument.").

Accordingly, the Court finds that the multitude of serious, independent, documented, and therefore good faith complaints against Plaintiff undermine any attempt to paint Defendant's stated reason for dismissing Plaintiff as trumped-up or pretextual. In fact, given the grave concerns regarding Dr. Saenger's behavior towards female employees, Defendant could reasonably have feared that *not* terminating Plaintiff could have subjected the hospital to liability. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("An employer is negligent with respect to sexual harassment [and thus liable for it] if it knew or should have known about the conduct and failed to stop it.").

Plaintiff's theory of the case suffers from a still more fundamental problem: it simply does not make sense. The Supreme Court has recognized that "age discrimination rarely was," and rarely is, "based on the sort of animus motivating some other forms of discrimination," such as race or gender discrimination. *EEOC*

*v. Wyoming*, 460 U.S. 226, 231, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). Instead, "[i]t is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age.... [T]he ADEA was prompted by [the] concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Accordingly, the ADEA forbids employers from "rely[ing] on age as a proxy for an employee's remaining characteristics, such as productivity." *Id.* at 611, 113 S.Ct. 1701. But here, it is undisputed—and undisputable—that Dr. Saenger was, and is, a gifted physician at the top of his field. (Def.'s Mem. 1; Pl.'s 56.1 ¶ 2.) Dr. Saenger demonstrated his professional prowess by continuing to secure lucrative grants (Pl.'s 56.1 ¶ 72), and to receive coveted distinctions, (Saenger Dep. 30). Indeed, Dr. Saenger received his annual bonuses up through 2004, and was viewed as a highly competent medical professional. Frankly, the record indisputably demonstrates that Defendant tolerated Dr. Saenger's indiscretions because of his medical know-how and reputation in the medical community. Thus, Plaintiff does not and cannot allege that he was terminated because the hospital assumed that because of his age he could no longer cut it as a pediatric endocrinologist. Nor does he offer any other narrative under which his firing could plausibly have been age-related.[9]

Plaintiff's tendered proof is insufficient to allow a rational jury to conclude that Defendant's rationale for terminating Plaintiff was a pretext for age discrimination. First, Dr. Saenger notes that he completed twenty-five years of successful service at Montefiore, but, at age sixty-two, was replaced as Chief of the Pediatric Endocrinology Department by Dr. DiMartino–Nardi, who was twelve years his junior. (Pl.'s 56.1 ¶ 78.) These facts alone are insufficient to show that Defendants' stated reasons for firing Plaintiff are pretextual. *See Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 317 (2d Cir.1999) (holding that summary judgment was properly granted even though the forty-seven-year-old Plaintiff was replaced by a thirty-three-year-old); *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 715, 719 (2d Cir.1994) (holding that summary judgment was proper even though the employ-

---

**9.** It is also worth noting that Dr. Haddad was fifty-eight years old—just five years younger than Dr. Saenger—when he recommended Dr. Saenger's termination. (Def.'s 56.1 ¶ 7.) Of course, a member of a protected class may discriminate against fellow members. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 55 (2d Cir.1998) ("The proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable."). But, a number of courts have recognized that they are less likely to do so than nonmembers of the protected class. *See Drummond v. IPC Int'l, Inc.*, 400 F.Supp.2d 521, 532 (E.D.N.Y.2005) ("[A] well-recognized inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class."); *Brooks,* 2005 WL 1875772, at *4–7 (granting defendant's summary judgment motion, in part, because two employees who were involved in the decision to fire Plaintiff, then sixty-one, were over sixty); *Anderson v. Anheuser–Busch, Inc.*, 65 F.Supp.2d 218, 229 (S.D.N.Y.1999) ("That [the decision-maker] was a member of [plaintiff's] protected class ... further weakens the inference of discrimination."); *Marlow v. Office of Court Admin. of State of N.Y.*, 820 F.Supp. 753, 757 (S.D.N.Y.1993) (noting that some of Defendant's "employees who participated in the [adverse] decision" were themselves over 40, thus making Plaintiff's "claims of discrimination become less plausible"), *aff'd,* 22 F.3d 1091 (2d Cir.1994). Thus, at a minimum, that Dr. Haddad was just five years junior to Plaintiff (and in the protected category) is not a helpful fact for Plaintiff.

ee retained when plaintiff was fired was "much younger"); *Brooks*, 2005 WL 1875772, at *8 (finding that, while the fact that plaintiff was passed over for someone ten years younger "is sufficient to meet the minimal burden [of stating] a prima facie case," it is not sufficient to show pretext). Moreover, the probative value of Dr. DiMartino–Nardi's age is undercut by the fact that Dr. DiMartino–Nardi, at age fifty, was the most senior person in the Pediatric Endocrinology Department, and was hired by Dr. Saenger himself, presumably because he deemed her skilled and capable. (Def.'s 56.1 ¶ 64.) In any event, Dr. DiMartino–Nardi's age is collateral to the record of Plaintiff's misconduct that was made available to Defendant.

Second, Dr. Saenger questions the timing and stated reasons for his termination. Plaintiff thus seeks to prove that he was fired because of his age by showing that the he was *not* fired for the reasons Defendant claims. This is a permissible strategy. *See Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."); *St. Mary's Honor Ctr.*, 509 U.S. at 511, 113 S.Ct. 2742 ("The factfinder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination."). But to survive a summary judgment motion using this strategy, Plaintiff must provide "sufficient evidence for [a rational] trier of fact to disbelieve the defendant's legitimate, nondiscriminatory explanation for its action." *Reeves*, 530 U.S. at 137, 120 S.Ct. 2097. This burden is not insub-

stantial. *See Viola*, 42 F.3d at 716–18 (finding that plaintiff "failed to adduce sufficient proof" that defendant's justification was pretextual, despite the showing that "(1) [plaintiff] received his only poor performance review in twelve years of employment four months before his discharge; (2) at about the same time that [defendant] decided to implement a reduction in force, the company ... [hired] a younger employee ...; and (3) within a year following [plaintiff's] dismissal, [defendant] hired a new employee" to fill a similar position); [10] *Brooks*, 2005 WL 1875772, at *4 (rejecting plaintiff's attempt to defeat summary judgment by "poking holes in defendant's proffered explanation"). Plaintiff has failed to meet it.

Plaintiff asserts, oddly enough, that he "had largely the same personality and behavior since he began working at Montefiore in 1979." (Pl.'s Mem. 18.) Plaintiff thus finds it suspicious that "Defendant did not take any real action [against Plaintiff] until 2002, when he turned 60." (*Id.*) But there is no evidence that Defendant received as many complaints about Plaintiff prior to 2002, as it did post–2002. Moreover, even if Defendant did receive similar complaints before 2002, Defendant's change in attitude towards Plaintiff's misconduct is adequately explained by Dr. Haddad's 2002 appointment as Chair of the Pediatric Department. (Def.'s 56.1 ¶ 5.) Just because other department chairs might have tolerated Dr. Saenger's antics does not mean that Dr. Haddad was required to, especially when doing so could leave Defendant vulnerable to lawsuits. *See Ellerth*, 524 U.S. at 759, 118 S.Ct. 2257 ("An employer is negligent with respect to sexual harassment [and

---

**10.** *Viola* is good law despite being decided before *Reeves* because the Second Circuit has applied the rule articulated in *Reeves* since at least 1993. *See DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170 (2d Cir.1993) ("Proof

that the employer has provided a false reason for its action permits the finder of fact to determine that the defendant's actions were motivated by an improper discriminatory intent, but does not compel such a finding.").

thus liable for it] if it knew or should have known about the conduct and failed to stop it."). And, the undisputed evidence here is that Dr. Haddad had received serious complaints about Dr. Saenger's misconduct almost immediately after he was put in charge of revamping the Pediatric Department. Thus, Plaintiff's suspicion as to the timing of Dr. Haddad's understandable reaction to the many complaints against's Dr. Saenger is just that—suspicion unsupported by any evidence.

Plaintiff also disputes Defendant's claim that he was fired, in part, because of the sexual harassment allegation against him, because Plaintiff was not fired until a year after that allegation was made, and even received a full bonus for the year in which the allegation was made (i.e., July 2003 through June 2004). (Haddad Dep. 197–98.) Judge Amon rejected a similar argument in *Cadet*. There, plaintiff, a hospital janitor, had been accused of entering a patient's room despite her request that he come back later, thereby seeing her naked. *Cadet*, 1999 U.S. Dist. LEXIS 23582, at *8–9. In response, the hospital suspended plaintiff and warned that the next infraction could result in his termination. *Id.* at *10. Four months later, Plaintiff was terminated after taking an unauthorized coffee break. *Id.* at *11. Rather than finding that defendant's delay in firing plaintiff indicated pretext, Judge Amon granted Defendant summary judgment, crediting defendant's argument that defendant's "leniency toward plaintiff" showed that defen-

dant did not "harbor[ ] animosity toward plaintiff." *Id.* at *38–39; *see also Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980) ("[T]he fact that [plaintiff] was kept on for many months after it was determined that he could not perform at an acceptable level of competence … shows a high degree of patience and consideration for [plaintiff].") Similarly, in this case, Montefiore's restraint in choosing not to fire Dr. Saenger when it had clear justification to do so, if anything, shows that Montefiore did not harbor discriminatory animus towards Dr. Saenger. Indeed, as noted above, the undisputed evidence suggests that Defendant gave Plaintiff preferential treatment (to the chagrin of many other employees) because of his skills and reputation as a highly qualified doctor.[11]

Plaintiff also contends that the decision not to terminate him for cause casts doubt on Defendant's proffered basis for termination. (Pl.'s Mem. 19–20). Dr. Haddad testified that Dr. Saenger was not dismissed for cause because Dr. Haddad (1) did not want Dr. Saenger to leave immediately, (2) did not want to unnecessarily harm Dr. Saenger's career, and (3) did not believe that Dr. Saenger's offenses could support a for-cause dismissal, based on advice of counsel. (Def.'s 56.1 ¶¶ 79–80; Haddad Dep. 193–95.) That Dr. Haddad was hesitant to lose Dr. Saenger immediately again demonstrates that Dr. Haddad thought highly of Dr. Saenger's professional skills and did not "believe[ ] that produc-

11. In *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29 (2d Cir.1994), the Second Circuit reversed the district court's grant of summary judgment where the plaintiff received a three percent raise six months into his nine-month tenure. *Id.* at 39, 41. The Second Circuit relied on this fact in concluding that a rational jury could reject defendant's assertion that plaintiff was fired for poor performance. *Id.* at 39. The Second Circuit also relied on several other pieces of evidence, including the fact that a recent evaluation criticized all elev-

en of plaintiff's co-workers, but not plaintiff. *Id.* Moreover, in stark contrast to Dr. Saenger's disciplinary history, the plaintiff in *Chambers* had no documented history of misconduct. *See id.* (noting that there is "not a single mention of [the alleged] problem[s] in [plaintiff's] personnel file"). Thus, while *Chambers* may suggest that Plaintiff's bonus is of some probative value, it does not hold that that fact alone creates a triable issue of pretext.

tivity and competence decline with old age,"—a belief that the Supreme Court called "the very essence of age discrimination." *Hazen Paper*, 507 U.S. at 610, 113 S.Ct. 1701. Further, while the concern that the record would not support a dismissal for cause may have been unfounded, Defendant's counsel might have simply wished to avoid litigating the question. Indeed, before Plaintiff's termination, Plaintiff's counsel had already raised the specter of litigation. (Def.'s Ex. D–7 (suggesting that Plaintiff's termination could result in "a protracted public proceeding which will be distracting, time consuming, and costly").) [12] Accordingly, Plaintiff has failed to raise a triable issue as to whether Defendant offered "inconsistent" reasons for his termination. *See Brooks*, 2005 WL 1875772, at *6 (rejecting plaintiff's attempt "to cast doubt on [defendant's] proffered

rationale on the basis of a supposed 'flip-flop' ").[13]

Third, Dr. Saenger alleges that other physicians were treated more favorably because they were younger. Certainly, "a permissible inference of discriminatory intent may" be drawn from "the more favorable treatment of employees not in the protected group." *See Chambers*, 43 F.3d at 37. Plaintiff alleges that Dr. DiMartino–Nardi, who was fifty when tapped to replace Dr. Saenger as department chair, was given more free rein in running the department than the veteran Dr. Saenger ever was. (Saenger Dep. 190, 199.) When Dr. Saenger was department head, he claims that Dr. DiMartino–Nardi flatly refused his request that she adjust her schedule, and that Dr. Haddad did nothing when Dr. Saenger reported the incident. (*Id.* at 190, 196–97, 207–08.) By contrast,

---

**12.** The other alleged inconsistencies in Defendant's stated reasons for terminating Plaintiff are almost too transparently contrived to require refutation. Plaintiff insists that Defendant's testimony is "inconsistent" because "Dr. Haddad testified that [Plaintiff was terminated] for behavior, while Dr. Currie said it was for insubordination." (Pl.'s Mem. 24.) Dr. Haddad's deposition, however, painstakingly describes the litany of complaints against Dr. Saenger (*see, e.g.*, Haddad Dep. 61, 125–28, 160, 180), which includes his last documented incident of misconduct—refusing to show up at Jacobi in January 2005 (*id.* at 180 ("Dr. Saenger had clinics there that he refused to go to.... [T]hat's a problem.").). In this context, it is clear that when Dr. Haddad testified that Dr. Saenger was fired for "behavioral and attitudinal issues," he was referring, among other problems, to insubordination. Plaintiff also notes that "Dr. Currie first testified that the termination was for cause and then agreed that it was not." (Pl.'s Mem. 25.) This lapse of memory at a deposition taken three years after the fact is not an inconsistent rationale which could possibly cast doubt on Defendant's stated justification for firing Plaintiff.

**13.** Even if Plaintiff could provide sufficient evidence to reject Defendant's explanation for firing him, Plaintiff would not necessarily

survive summary judgment, especially considering the long and credible list of complaints against him. *See Reeves*, 530 U.S. at 148, 120 S.Ct. 2097 (noting that "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory," such as where "the plaintiff create[s] only a weak issue of fact as to whether the employer's reason [is] untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred"); *Schnabel*, 232 F.3d at 90 ("[F]ollowing *Reeves*, we decline to hold that no ADEA defendant may succeed on a summary judgment motion so long as the plaintiff has established a prima facie case and presented evidence of pretext. Rather, ... *Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " (quoting *Reeves*, 530 U.S. at 143, 120 .S.Ct. 2097) (emphasis deleted)).

Dr. Saenger was reprimanded and ultimately terminated for merely wanting to discuss his Jacobi assignment with Dr. DiMartino–Nardi. (*Id.* at 196–97, 207–08.)

■ But, vague claims of differential treatment alone do not suggest discrimination, unless those treated differently are "similarly situated in all material respects." *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir.1997). Here, Plaintiff has given no specific information about what his demand of Dr. DiMartino–Nardi was, and if it even was reasonable. Moreover, while Plaintiff provides no details of Dr. DiMartino–Nardi's alleged refusal to accept an assignment from him, it appears that she at least informed him that she would not accept the assignment. (*See* Pl.'s 56.1 ¶ 65 ("[Dr. DiMartino–Nardi] *flatly refused* to take on another assignment when asked to do so.") (emphasis added).) Refusing to accept an assignment is one thing, simply failing to show-up without notice when patients are expecting a doctor is quite another. Also, Dr. Saenger has offered no evidence that he complained to hospital administrators about this alleged incident or that they refused to reprimand Dr. DiMartino–Nardi for her conduct. Moreover, Dr. DiMartino–Nardi was also materially different from Plaintiff because she did not have an extensive disciplinary history, and had not been repeatedly warned that additional misconduct could result in termination. In short, there is nothing comparable about Drs. DiMartino–Nardi and Saenger that remotely demonstrates age discrimination.

Similarly, Dr. Saenger believes that Defendant favored Dr. Ozuah, who is twenty years younger, on account of his age.[14] Specifically, Dr. Saenger references an altercation he had with Dr. Ozuah in which Dr. Ozuah used profanities and allegedly leaned over Dr. Saenger's desk and physically intimidated him. (Pl.'s 56.1 ¶ 41.) Although Dr. Saenger reported this incident and demanded an apology (Def.'s Ex. D–4), the incident was not investigated and no one ever spoke to Dr. Saenger about it. (Pl.'s 56.1 ¶ 102(a).) Dr. Currie explained that he found Dr. Saenger's account "hard to believe" based on his knowledge of Dr. Ozuah's character and demeanor. (Currie Dep. 148–49.) Dr. Saenger remarked on this incident: "I was obviously not being believed, so it was only handled in a lopsided fashion, leading me to believe that my age was a factor." (Saenger Dep. ¶ 140.)

Employers must frequently resolve credibility disputes between employees. These resolutions do not suggest discrimination unless the two employees are "similarly situated in all material respects." *Shumway*, 118 F.3d at 64. Here, Dr. Currie sided with Dr. Ozuah based on his knowledge of Drs. Ozuah and Saenger, the latter of whom had, to put it charitably, earned the ire of his colleagues for intemperate and imprudent behavior. (Currie Dep. 148–49.) No reasonable fact-finder could fault Defendant for how it dealt with Dr. Saenger's disputes with Drs. DiMartino–Nardi and Ozuah without becoming a "super-personnel department that reexamines . . . business decisions." *Scaria*, 117 F.3d at 655 (quotation marks omitted).

Dr. Saenger believes the sexual harassment investigation of him was also handled in a lopsided fashion because Dr. Saenger

---

**14.** Even though both Dr. DiMartino–Nardi and Dr. Ozuah are over forty and thus members of the class protected by the ADEA, the Court will assume *arguendo* that an inference could still be drawn from their more favorable treatment because they are substantially younger than Dr. Saenger. *Cf. O'Connor,* 517 U.S. at 313, 116 S.Ct. 1307 ("[T]he fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.").

was not interviewed or even informed of the specific charges against him until after the investigation had concluded and his punishment had been determined. (Pl.'s 56.1 ¶ 103; Pl.'s Mem. 5.) The ADEA, of course, does not mandate that employers use any particular procedures for investigating allegations of employee misconduct. Defendant's investigatory procedures are only relevant if they give rise to an inference that the investigation was a sham designed to mask Defendant's discriminatory agenda. *See Adia*, 2006 WL 2092482, at *9 (finding that "there is no statutory violation" when an employer relies on an investigation's findings "in good faith"); *Gorley*, 2000 WL 1876909, at *7 (noting that if the defendant relied "in good faith" on the results of an investigation, "its dismissal of plaintiff would not violate Title VII"); *Havelick v. Julius Wile Sons & Co.*, 445 F.Supp. 919, 926 (S.D.N.Y.1978) (finding that the fact that Defendant "never made any 'objective' evaluation of the plaintiff's job performance" does not "demonstrate that the decision" to fire him for poor performance "was not made in the exercise of good faith business judgment"); *see also Parra v. Four Seasons Hotel*, 605 F.Supp.2d 314, 332 (D.Mass.2009) ("The fact that the Hotel disciplined the wrong employee on the basis of an error or mistake is not the type of personnel decision that Title VII stands to remedy.").

Here, the Court finds nothing improper about Defendant's decision to delay informing Dr. Saenger about the specifics of the allegation against him, or interviewing him earlier about the allegation. Dr. Currie met with Dr. Saenger before the investigation began and told him that somebody had made a "very serious accusation about his personal behavior," that this alleged accusation could have "state reportability consequences," and that the hospital was "taking it very seriously." (Currie Dep. 120.) Dr. Currie further explained that there would be a "thorough review" of the

allegation and that Dr. Saenger would get a "fair review." (*Id.*) Dr. Currie also told Dr. Saenger that he thought it advisable that Dr. Saenger take a voluntary leave with pay. (*Id.*) According to Dr. Currie, he took this approach to allow for an expeditious investigation to avoid any further reporting obligations. (*Id.*) Dr. Saenger, according to Dr. Currie, agreed to this procedure. (*Id.*) Dr. Currie further testified that he did not tell Dr. Saenger that the allegations involved sexual harassment, or who made the allegations, because Dr. Saenger's "past behavioral issues" led Dr. Currie to believe that Dr. Saenger "would not be able to resist trying to confront his accuser or to try to get additional information." (Currie Dep. 121–22.) In light of this explanation, the Court finds that no rational fact-finder could find that Defendant's investigation of Dr. Larkin's complaint was a sham intended to mask age discrimination.

Fourth, Dr. Saenger alleges that Montefiore has exhibited a pattern of demoting or terminating older workers. (Pl.'s 56.1 ¶ 107.) Again, this is a permissible strategy for surviving summary judgment. *See Maresco v. Evans Chemetics*, 964 F.2d 106, 113 (2d Cir.1992) ("The decision to terminate two of the three older accounting employees, and none of the twenty younger employees, presents circumstances which give rise to an inference sufficient to withstand a motion for summary judgment...."); *Kourofsky v. Genencor Int'l, Inc.*, 459 F.Supp.2d 206, 213–14 (W.D.N.Y.2006) (denying summary judgment, in part, because "an older worker at the Plant was more than three times as likely to be terminated as a younger worker").

 But, Plaintiff's proffered evidence of a pattern of discrimination does not meet certain minimal standards. For starters, statistical evidence, such as it is

in this case, must be supported by expert analysis. *See LaMarch v. Tishman Speyer Props., L.P.,* No. 03–CV–5246, 2006 WL 2265086, at *6 (E.D.N.Y. Aug. 8, 2006) ("[Plaintiff's] statistical evidence regarding the terminations of employees older than 40 would be inadmissable because it is not supported by any expert analysis ...."); *accord Kadas v. MCI Systemhouse Corp.,* 255 F.3d 359, 363 (7th Cir.2001) (noting that, when statistical evidence is offered to show age discrimination, "[i]t is for the judge to say, *on the basis of the evidence of a trained statistician,* whether ... the study [is] worth the consideration of judge or jury" (emphasis added)). Indeed, without expert analysis, courts would have a difficult time ensuring that juries consider only "statistically significant" data. *See Ottaviani v. SUNY New Paltz,* 875 F.2d 365, 371 (2d Cir.1989) ("Not all disparities ... are probative of discrimination. Before a deviation from a predicted outcome can be considered probative, the deviation must be 'statistically significant.'"); *cf. Smith v. Xerox Corp.,* 196 F.3d 358, 366 (2d Cir.1999) ("Courts generally consider [a variance of two standard deviations] sufficient to warrant an inference of discrimination."), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.,* 461 F.3d 134 (2d Cir.2006).

Defendant has provided a list of all doctors who left Montefiore between 2003 and 2006, their ages, and their reasons for departing. (Def.'s Ex. J.) But Plaintiff does not offer any expert testimony analyzing these statistics (indeed, Plaintiff does not even claim that the rate of termination for older employees at Montefiore exceeds the rate of termination for younger employees). Without such testimony (expert or otherwise), this statistical evidence could not be used to persuade a rational jury to infer that Defendant discriminated against Plaintiff.

■ Further, the statistics that have been submitted to the Court are incomplete and anecdotal. In particular, the data in the record only contains the ages of the doctors who Defendant fired, it does not provide the ages of the doctors that Defendant did *not* fire. Thus, even if Plaintiff could show that Defendant fired more older doctors than younger doctors,[15] Plaintiff still could not establish that older doctors were *more likely* to be fired than younger doctors, because it could be that Defendant simply employs more older doctors. Courts routinely reject statistics that are not sufficiently complete to imply a pattern of discrimination. *See, e.g., Pasha v. William M. Mercer Consulting, Inc.,* No. 00–CV–8362, 2004 WL 188077, at *6–7 (S.D.N.Y. Feb. 2, 2004) (rejecting plaintiff's statistics regarding the ages of those hired by defendant because plaintiff failed to provide sufficient information regarding the ages of the applicant pool); *Gambello v. Time Warner Commc'ns, Inc.,* 186 F.Supp.2d 209, 224 (E.D.N.Y. 2002) ("Evidence that five out of thirty terminated employees were age-protected, without evidence of the total number of age-protected employees before and after the terminations and the percentage of discharged employees who were age-protected, is insufficient to establish age-discrimination."); *Guider v. F.W. Woolworth Corp.,* No. 96–CV–3168, 1998 WL 702275, at *11 (S.D.N.Y. Oct. 7, 1998) ("Plaintiff's statistical evidence only accounts for the ages of those individuals hired, while ignoring the ages of those individuals who applied for the position.... Without accounting for these factors, the statistics do not support an inference of age discrimi-

---

**15.** In fact, Plaintiff does not even allege this. The only information that has been submitted to the Court is a list of the doctors who left Montefiore between 2003 and 2006, their dates of birth, and their reasons for departing. Plaintiff provides no analysis of this raw data.

nation."). Accordingly, these statistics do not help Plaintiff survive summary judgment.[16]

The rest of Plaintiff's evidence of a pattern of discrimination is hearsay and speculation. Such evidence cannot be used to defeat a motion for summary judgment. *See LaMarch*, 2006 WL 2265086 at *6 (refusing to consider both "testimony regarding other employees' statements about age discrimination," because it was hearsay, and "testimony regarding [plaintiff's] own perception of a 'pattern' of terminating older employees," because it was speculation). Plaintiff lists ten doctors who he says were "terminated or otherwise departed under circumstances similar to Dr. Saenger or that otherwise could raise an inference of age discrimination." (Pl.'s 56.1 ¶ 107) Plaintiff does not, however, list these former employees' ages, nor does he specify the circumstances of their departure from Montefiore. When pressed at his deposition, Dr. Saenger provided little, if any, additional information about these allegedly age-based firings. (Saenger Dep. 60–75.) For instance, Plaintiff testified that he believed that a Dr. Schonberg was terminated on the basis of age "[b]ecause he was [a] similar age as I was," and because Dr. Saenger "thought he was doing a good job." (Saenger Dep. 62.) Likewise, Dr. Saenger did not know whether a Dr. Bernstein left involuntarily or voluntarily (*id.* at 67), or even how old he was at the time of his departure (*id.* at 71). When pressed, Dr. Saenger admitted that

the source of his knowledge regarding Dr. Bernstein was "talk in the hallways." (*Id.* at 65.) Thus, to the extent Plaintiff offers any evidence regarding these allegedly age-based firings, he offers hearsay and speculation.

Plaintiff also mentions that seven "older employees" were given severance or settlement agreements, and alleges that some have filed formal, administrative claims of discrimination against Montefiore. (*Id.*) Again, however, no specifics about these individuals is found in the record. And, the deposition testimony that Plaintiff cites regarding the severance agreements provides nothing approaching an admission of age discrimination. (Dep. of Robert Conaty ("Conaty Dep.") 57–76.)[17] Even if it did, settlements are generally inadmissible under Federal Rule of Evidence 408. *See* Fed.R.Evid. 408(a)(1) (excluding evidence of "furnishing ... valuable consideration in compromising or attempting to compromise [a] claim" that "was disputed," for the purpose of proving liability for the claim).

Allegations of age discrimination made by other Montefiore employees are likewise inadmissible because they are hearsay. *See LaMarch*, 2006 WL 2265086 at *6. At oral argument, Plaintiff's counsel argued that the allegations are not hearsay because they are not offered for truth but to show that the speakers believed them. Other employees' beliefs that Defendant has discriminated against them, however, are not relevant except as evidence that

---

**16.** At oral argument Plaintiff's counsel complained that they requested more information about these doctors, but were denied by the magistrate judge supervising discovery. However, counsel neither made a motion under Federal Rule of Civil Procedure 56(f), nor appealed the magistrate judge's rulings to this Court. Thus, Plaintiff is left with the record as is.

**17.** Indeed, Plaintiff's counsel's questioning of Dr. Conaty regarding these settlement agree-

ments did not get anywhere. (*See, e.g.*, Conaty Dep. 59 ("Q. Do you know whether such severance agreements are given in cases where the physician raises a complaint of discrimination? A. I'm not aware."); *id.* at 68–69 ("Q. Are you aware of any of the circumstances surrounding Dr. Harris' departure from Montefiore?" A. Only in that my understanding is that he retired.... "Q. Okay. Are you aware whether anyone at Montefiore persuaded or pressured Dr. Harris to retire? A. Not aware.").

518

Defendant did discriminate against them. But, the Federal Rules of Evidence explicitly block such an end run around the hearsay rule. *See* Fed.R.Evid. 803(3) (noting that the "state of mind" exception to the hearsay rule does "not includ[e] a statement of memory or belief to prove the fact remembered or believed").

Finally, Plaintiff provides two anecdotes to show that Defendant submitted inaccurate records to the Court regarding the reasons former employees left Montefiore. The table which Defendant submitted to the Court lists Dr. Saenger's reason for leaving Montefiore as "other-voluntary," which Dr. Saenger notes was emphatically not the case. (Def.'s Ex. J.) Likewise, when Dr. Spivak, age fifty-three, was replaced as the head of the gastroenterology department, the hospital listed the reason as "reorganization," even though it appears that Spivak's departure was the only change in that "reorganization." (Haddad Dep. 257–58, 265.)

■ Evasive behavior can indicate that a defendant is hiding evidence of discrimination. *See Chambers*, 43 F.3d at 38 ("The factfinder's disbelief of the reasons put forward by the defendant (*particularly if disbelief is accompanied by a suspicion of mendacity* ) may, together with the elements of the prima facie case, suffice to show intentional discrimination." (emphasis added)); *Kourofsky*, 459 F.Supp.2d at 212 (finding that the fact that both plaintiffs received negative performance reviews a day after they were told of their termination is evidence of pretext); *Sklaver v. Casso–Solar Corp.*, No. 02–CV–9928, 2004 WL 1381264, at *8 (S.D.N.Y. May 15, 2004) ("[W]hen the employee only learns of [a] negative performance review after his termination . . . a reasonable jury could conclude [that this] constitute[s] a post-hoc attempt to justify the . . . decision." (internal quotation marks and ellipse omitted)).

But, in contrast to the post-hoc efforts to manufacture a history of discipline at issue in *Kourofsky* and *Sklaver*, Montefiore's misstatements, if they were intentional, appear designed to protect rather than tarnish the reputation of their former employees. Such misstatements do not justify an inference of age discrimination. *See Hughes v. Black Hills Power & Light Co.*, 585 F.2d 918, 920 (8th Cir.1978) ("[Plaintiff] makes much of the fact that his employment record states that the reason for his discharge was a 'layoff' due to adverse economic conditions. . . . Company officials testified that the true reason for [plaintiff's] discharge was not set forth in order not to embarrass him. . . . [The misstatement] does not detract . . . from the evidence . . . that the Company's dissatisfaction with [plaintiff's] performance was the true reason for his discharge.").

For all of the foregoing reasons, especially Plaintiff's long and documented history of discipline and his complete failure to offer evidence that this history of discipline was a pretext for age discrimination, the Court finds that a rational jury could not conclude that age was a factor in Defendant's decision to terminate Plaintiff, let alone the "but-for" cause of that decision.

### 2. Retaliation Claim

Plaintiff claims that he was demoted and ultimately terminated because he complained about age discrimination. (Pl.'s Mem. 22–24.) On April 1, 2004, after Montefiore placed Dr. Saenger on administrative leave while it investigated an allegation that he sexually harassed a resident (Def.'s 56.1 ¶¶ 46, 48), Dr. Saenger's attorney sent a letter to Defendant alleging that "Dr. Saenger's age (62) may have been a motivating factor in the determination to place him out on administrative leave (which we believe will likely result in his termination)." (Def.'s Ex. D7.) This

was the only time Plaintiff ever complained to Defendant about age discrimination. On May 17, 2004, the hospital informed Dr. Saenger that its investigation revealed that he had exhibited "a pattern of inappropriate and unprofessional conduct towards women." (Def.'s Ex. D–6.) The letter told Dr. Saenger that he was allowed to return to work, but warned that "similar unprofessional behavior" would render him "subject to termination." (*Id.*) Upon returning to work, on May 21, 2004, Dr. Haddad informed Dr. Saenger that he was being removed from his position as Chief of the Pediatric Endocrinology Department because of the continuing series of complaints against him. (Def.'s 56.1 ¶ 63.) Roughly a year later, Plaintiff was fired. (*Id.* ¶ 83.)

■ A claim of retaliation, like a claim of discrimination, is analyzed under the *McDonnell Douglas* framework. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir.2001). To make out a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in protected activity; (2) that the defendant was aware of that activity; (3) that he suffered an adverse employment decision: and (4) that there was a causal connection between the protected activity and the adverse employment action. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir. 1995). Plaintiff cannot present a prima facie case because he cannot show a causal connection between his complaint of age discrimination and his demotion and subsequent termination.

■ A plaintiff fails to allege a sufficient causal connection between protected activity and adverse employment action when the protected activity is preceded by significant misconduct, and the employee's gradual efforts to address that misconduct. *See Slattery*, 248 F.3d at 95 ("Where timing is the only basis for a claim of retaliation, and gradual adverse

job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); *Cadet*, 1999 U.S. Dist. LEXIS 23582, at *42–43 ("[S]ummary judgment is appropriate in this case … since defendant's decision to terminate plaintiff was based, in part, on plaintiff's long record of disciplinary problems that occurred before he even filed his EEOC charge."); *Lawson v. Getty Terminals Corp.*, 866 F.Supp. 793, 804 (S.D.N.Y.1994) (dismissing retaliation claim for failure to show causation where problems with job performance were pointed out and acted upon by plaintiff's supervisor prior to protected activity).

■ Here, Plaintiff complained of age discrimination *after* he was accused of very serious misconduct (including sexual harassment), and while Defendant was investigating one of those allegations. That investigation revealed other women who were concerned about Plaintiff's allegedly inappropriate conduct. Moreover, in the same letter that Plaintiff now contends was the motivation for his demotion, Plaintiff's attorney predicted that the investigation would lead to his termination. Plaintiff therefore has no retaliation claim because, before he ever engaged in protected activity, he was the subject of an investigation which his own attorney thought would result in his termination. Put bluntly, Plaintiff cannot use the threat of a discrimination lawsuit to immunize himself from the reasonable and foreseeable consequences of his misconduct, especially misconduct that pre-dates any protected activity.

Plaintiff's claim that he was fired in June 2005 for his April 2004 complaint enjoys even less support. Plaintiff was fired over a year after complaining of age discrimination, outside the normal zone of tolerable temporal proximity. *See Dauer*

*v. Verizon Commc'ns Inc.*, 613 F.Supp.2d 446, 466 (S.D.N.Y.2009) (" 'Claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and alleged act of retaliation.' " (quoting *Nicastro v. Runyon*, 60 F.Supp.2d 181, 185 (S.D.N.Y.1999))); *Perry v. N.Y. Dept. of Labor*, No. 08–CV–4610, 2009 WL 2575713, at *6 (S.D.N.Y. Aug. 20, 2009); ("[A] gap of more than one year between protected activity and retaliatory action is generally insufficient."); *Ponticelli v. Zurich Am. Ins. Group*, 16 F.Supp.2d 414, 436 (S.D.N.Y.1998) (noting that the protected activity took place "at least two-and-a-half months before [plaintiff's] termination" and finding that "[t]his is hardly the close proximity of time contemplated by [the Second Circuit] for allowing a plaintiff to establish the 'causal connection' element of retaliation claim"); *Zenni v. Hard Rock Cafe Int'l, Inc. (N.Y.)*, 903 F.Supp. 644, 656 (S.D.N.Y.1995) (dismissing retaliation claim, in part, because plaintiff's "ultimate termination was more than a year after he" engaged in protected activity); *cf. Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir.1990) (affirming dismissal of retaliation claim where protected activity occurred three months before the alleged act of retaliation).

Defendant would certainly have been justified in firing Plaintiff in May 2004, a month after Plaintiff's complaint, when Defendant's investigation of the sexual harassment allegation against Plaintiff revealed that Plaintiff had engaged in "a pattern of inappropriate and unprofessional conduct towards women." (Def.'s Ex. D–6.) That Defendant did not fire Plaintiff at that time fatally undermines Plaintiff's claim that his subsequent termination was in retaliation for his prior complaint. *See Flax*, 618 F.2d at 1067 ("[T]he fact that [plaintiff] was kept on for many months after it was determined that he could not perform at an acceptable level of competence ... shows a high degree of patience and consideration for [plaintiff]."); *Cadet*, 1999 U.S. Dist. LEXIS 23582, at *38, *41–42 (crediting defendant's argument that its agent "could have terminated plaintiff years earlier—when he had the authority to do so—if he actually harbored animosity toward plaintiff").

Even if Plaintiff could make out a prima facie case, his retaliation claim would still fail because, as noted, Defendant has established a neutral justification for demoting, and ultimately terminating, Plaintiff, which Plaintiff cannot show is pretextual. *See id.* at *41–42 ("Defendant's [non-pretextual, legitimate business reason for terminating plaintiff] applies with equal force to the claim of retaliation; summary judgment for defendant is appropriate on that basis."). Therefore, the Court finds that a rational jury could not conclude that Plaintiff's complaint of age discrimination was a factor in Defendant's decisions to demote and eventually terminate Plaintiff.[18]

### 3. *Contract Claim*

The Complaint alleges that Defendant breached its contract with Plaintiff by failing to pay Plaintiff a bonus in 2005. (Compl. ¶ 106.) Defendants' moving papers demonstrate that Plaintiff's bonus was wholly discretionary. (Def.'s Mem. 24–25.) At oral argument, Plaintiff explicitly abandoned this claim after not briefing

---

18. Plaintiff did not receive a discretionary bonus the year he was fired, and, after being fired, was not allowed to serve as a principal investigator on research protocols at Montefiore. Defendant submits these are the usual consequences of being terminated for misconduct. (Def.'s Mem. 23.) Plaintiff offers no admissible evidence to the contrary. Accordingly, Plaintiff cannot show that these actions were retaliatory for the same reasons that he cannot show that his termination was retaliatory.

it. Accordingly, the Court grants Defendants' motion for summary judgment as to this claim.

*III. Conclusion*

For the foregoing reasons, Defendant's motion for summary judgment is granted. The Clerk is respectfully directed to terminate the pending motion (Dkt. No. 33), enter judgment for Defendant, and close this case.

SO ORDERED.