**Tylie S. WATERS, Plaintiff,**

v.

**GENERAL BOARD OF GLOBAL MINISTRIES, Defendant.**

**No. 09 CV 7241(NRB).**

United States District Court, S.D. New York.

Feb. 25, 2011.

Edward H. Wolf, Jason M. Wolf, Wolf & Wolf, LLP, Bronx, NY, for Plaintiff.

Allen B. Roberts, Amy J. Traub, Robert R. Barravecchio, Epstein, Becker & Green, P.C., New York, NY, for Defendant.

### MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Tylie S. Waters ("Waters") brings this action against defendant General Board of Global Ministries of the United Methodist Church ("GBGM") pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., and the New York City Human Rights Law, N.Y. City Admin. Code § 8–101 et seq. In her complaint, Waters alleges that GBGM discriminated against her and harassed her on the basis of her age. Before us is GBGM's

motion for summary judgment. In its motion, GBGM argues that Waters: (1) has failed to support her claims with evidence; and (2) has not suffered actionable adverse employment action.

For the reasons discussed below, we grant GBGM's motion for summary judgment.

## BACKGROUND

### I. Employment History

GBGM is the global mission agency of the United Methodist Church.[1] (R. 56.1 ¶ 1.) GBGM hired Waters in 1993, when she was 45 years old. (R. 56.1 ¶¶ 10, 11.) Over the course of her nearly-twenty year career at GBGM, Waters has held a variety of positions.

In October 1993, Waters began working as an Administrative Assistant in the Mission, Education, and Cultivation Department.[2] (R. 56.1 ¶ 10.)

In January 2000, Waters was promoted to Production Assistant in GBGM's Coordinated Services Department. (R. 56.1 ¶ 13.) Seven months later, Waters filed an administrative complaint with the New York State Division of Human Rights ("NYSDHR"). In her complaint, Waters asserted that GBGM had discriminated against her on the basis of race by failing to increase her salary when she was promoted to Production Assistant. (R. 56.1 ¶ 14.) Shortly thereafter, Waters requested that the complaint be withdrawn and, as a result, NYSDHR dismissed her case. (R. 56.1 ¶¶ 15–16.)

In October 2001, Waters began working as a Computer Services Coordinator in the Coordinated Services Department. (R. 56.1 ¶ 17.) In this capacity, Waters reported to Wendy Whiteside ("Whiteside"), the Assistant General Secretary, who was approximately 50 years old at the time.[3] (R. 56.1 ¶¶ 20–21.)

In February 2005, Waters became the vice president of the Staff Association, the collective bargaining unit that represents GBGM's clerical and administrative employees. (R. 56.1 ¶¶ 8, 45–46.) As vice president of the Staff Association, Waters was expected to attend periodic meetings. (R. 56.1 ¶ 46.) These new responsibilities supplemented Waters' responsibilities as Computer Services Coordinator.

1. The background is derived from GBGM's Local Rule 56.1 Statement in Support of Defendant's Motion for Summary Judgment, dated August 23, 2010 ("R. 56.1"), the Declaration of Keri–Ann Williams ("Williams Decl."), dated August 20, 2010, and Waters' Local Rule 56.1 Counterstatement in Opposition to Defendant's Motion for Summary Judgment, dated October 12, 2010 ("Counter R. 56.1"). Unless otherwise noted, the facts recited herein are not subject to material dispute.

2. GBGM distributes a Staff Handbook and Manual of Policies to all employees when they commence their employment with GBGM. (R. 56.1 ¶¶ 3–5.) Included in the handbook are anti-discrimination and anti-harassment policies and procedures. (R. 56.1 ¶ 4.) Like other GBGM employees, Waters received a copy of the handbook when she commenced her employment in 1993. She again acknowledged receiving the handbook in 2004. (R. 56.1 ¶ 6.) Additionally, Waters was employed pursuant to a collective bargaining agreement between GBGM and the so-called Staff Association, a collective bargaining unit that represents GBGM's clerical and administrative employees. (R. 56.1 ¶¶ 7–8.) The collective bargaining agreement expressly incorporated GBGM's antidiscrimination and anti-harassment policies and procedures. (R. 56.1 ¶ 8.)

3. Waters disclaims knowledge of the age of many of her supervisors. (Counter R. 56.1 ¶¶ 21, 40, 79, 100.) However, she neither contests the accuracy of the ages listed in the Declaration of Keri–Ann Williams, dated August 20, 2010, nor does she cite to admissible evidence tending to show that the ages are incorrect.

In July 2007, Whiteside assigned a project to Waters and her colleague that involved sorting and organizing filing cabinets. (R. 56.1 ¶¶ 22.) Waters objected to the assignment and contended that it was outside the scope of her responsibilities as Computer Services Coordinator. (R. 56.1 ¶¶ 25–27.) Thereafter, Waters filed an unfair labor practices charge with the National Labor Relations Board ("NLRB"). (R. 56.1 ¶ 28.) In the charge, Waters asserted that GBGM harassed her by assigning her work that was below her grade level. Waters further alleged that such harassment was in retaliation for having filed grievances with the Staff Association. (R. 56.1 ¶ 29.) In October 2007, Waters requested that the NLRB withdraw her charge and the NLRB complied with her request. (R. 56.1 ¶ 30.)

In July 2007, Waters transferred positions and began working as a Program Assistant I in the Community and Institutional Ministry ("CIM") unit.[4] (R. 56.1 ¶ 35.) In this capacity, Waters reported to Amanda Choi ("Choi"), who was approximately 32 years old, and Chandran Nair ("Nair"), who was approximately 56 years old. (R. 56.1 ¶¶ 39–41.) Waters also reported, albeit indirectly, to the head of the CIM unit, Jerald McKie ("McKie"). McKie was approximately 54 years old at the time. (R. 56.1 ¶¶ 43–44.)

Finally, in August 2009, Waters began working as an Editorial Assistant.[5] (R. 56.1 ¶¶ 164–65.) Waters, who is presently 63 years old, remains employed by GBGM as an Editorial Assistant to this day. (R. 56.1 ¶ 166; Am. Compl. Ex. A.)

## II. Occurrences in the Community and Institutional Ministry Unit

Many of the allegations in Waters' amended complaint turn on issues that arose during Waters' tenure in CIM. As a result, we detail these issues to the extent necessary to analyze Waters' claim.

First, while working in CIM, Waters elected to take numerous training and refresher courses on basic computer skills, such as using Microsoft Word and Excel. (R. 56.1 ¶ 54.) To ensure that there was proper staff coverage during business hours, Waters was obligated to seek approval from her supervisors prior to attending these courses. (R. 56.1 ¶ 51.)

Second, GBGM employees in the CIM unit attended a variety of office social functions, including holiday parties. Waters was invited to such functions and was specifically encouraged by McKie to attend. (R. 56.1 ¶¶ 57–58.) However, Waters contends that she felt obligated to decline invitations because she felt that McKie discriminated against her. (Counter. R. 56.1 ¶¶ 57, 59.)

Third, pursuant to GBGM policy, all GBGM employees were required to seek and receive approval for vacation time. (R. 56.1 ¶¶ 60–61.) Between July 2007 and August 2009, Waters received such ap-

---

4. In or around July 2007, GBGM underwent a restructuring. As a result, Waters' position was combined with another position within the Coordinated Services Department. Waters was then presented with the option of working in the combined position, transferring to another department, or accepting a severance package. Waters elected to transfer to another department. (R. 56.1 ¶¶ 31–35.) Waters suffered no reduction in salary, benefits, or seniority as a result of this transfer. (R. 56.1 ¶¶ 36–37.)

5. On July 16, 2009, Waters was advised that her position in CIM was being eliminated. GBGM offered Waters the option of accepting a position as an Editorial Assistant or accepting a severance package. Waters accepted the Editorial Assistant position. (R. 56.1 ¶ 163.) There are no allegations or evidence that Waters suffered a reduction in salary, benefits, or seniority as a result of this transfer.

proval and took time off from work. (R. 56.1 ¶ 62.) However, Waters contends that during this time period, McKie directed Choi to cancel one of Waters' vacation requests. (Counter R. 56.1 ¶ 64.)

Fourth, according to GBGM, shortly after she transferred to CIM, Waters began to exhibit troubling conduct. This conduct included: being inexplicably absent from her desk during work hours; providing her supervisors with little or no notice before attending refresher courses or Staff Association meetings; acting in an insubordinate and discourteous fashion; and refusing to accept constructive criticism and feedback. (R. 56.1 ¶¶ 65–71.) This resulted in a series of meetings between Waters and her supervisors in March 2008. (R. 56.1 ¶¶ 72–74.) During these meetings, McKie and Choi advised Waters that she had to improve her performance, seek approval for time away from her desk, and treat her colleagues and supervisors with respect. (R. 56.1 ¶¶ 72–73.)

Following the March 2008 meetings, Waters complained to GBGM's Human Resources department that she was being treated in a discriminatory fashion. Waters also requested that she be transferred from CIM to another unit. (R. 56.1 ¶ 76; Counter R. 56.1 ¶ 76.) At no point during her discussions with Human Resources did Waters state that she was being treated differently as a result of her age. (R. 56.1 ¶ 77.)

On March 31, 2008, Waters submitted a memorandum to John Montgomery ("Montgomery"), GBGM's Employee Relations Manager. At the time, Montgomery was 68 years old. (R. 56.1 ¶¶ 78–79.) In this memorandum, Waters complained that she was being harassed by Choi, McKie, and Nair when she took vacation, personal time, or sick time. (R. 56.1 ¶ 78.) However, Waters again failed to allege that she was being treated differently as a result of her age. (R. 56.1 ¶ 80.) Montgomery responded to Waters and informed her that he believed that the supervisors' actions should be viewed as constructive, rather than punitive. (R. 56.1 ¶ 81.)

In the months that followed, Waters was admonished by her supervisors for: delegating work to colleagues without seeking prior authorization; watching tennis matches on the internet during work hours; browsing non-work-related websites during work hours in violation of GBGM policy; and failing to notify her supervisors before attending a Staff Association meeting, despite prior warnings about the need for advance notification. (R. 56.1 ¶¶ 83–97.)

As a result, Waters was asked to attend a meeting on June 10, 2008 with Choi, Nair, Montgomery, and Keri–Ann Williams, the Manager of Benefits and Staff Development. At the time, Williams was 31 years old. (R. 56.1 ¶¶ 99–100.) At this meeting, Waters was presented with three documents: (1) a written warning, dated June 9, 2008; (2) a performance management document; and (3) a Performance Improvement/Developmental Plan.[6] (R. 56.1 ¶ 101.) In response, Waters called her supervisors "liars," stated that everything they said regarding her performance was "bogus," and remained

---

**6.** The written warning addressed Waters' personal use of the internet, her disregard of her supervisor's instructions, her failure to notify a supervisor prior to attending a Staff Association meeting, and her unexplained absences during work hours. (R. 56.1 ¶ 102.) The performance management document specified GBGM's expectations for an individual employed in her position and provided concrete steps to help Waters meet those expectations. (R. 56.1 ¶ 103.) Finally, the Performance Improvement/Developmental Plan further specified how Waters could improve her performance and demeanor on the job. (R. 56.1 ¶¶ 104–09.)

generally unreceptive to feedback. (R. 56.1 ¶¶ 111–18.)

Following the June 10, 2008 meeting, GBGM's Human Resources Director, George Robinson ("Robinson"), referred Waters to the company's Employee Assistance Program ("EAP"). Robinson was 65 years old at the time. (R. 56.1 ¶¶ 119–20.) Waters attended six EAP sessions but, according to Waters, she only attended these sessions under threat of termination. (R. 56.1 ¶ 121; Counter R. 56.1 ¶¶ 119, 121.)

Shortly after the June 10, 2008 meeting, Waters submitted a memorandum entitled "Grievance Written Warning" to Robinson, Montgomery, and Williams. (R. 56.1 ¶ 122.) In the memorandum, Waters defended her performance and requested a transfer to another unit. (R. 56.1 ¶¶ 123, 125.) Yet again, Waters failed to allege that she had been the victim of discrimination or harassment on the basis of her age. (R. 56.1 ¶ 124.) Choi and Nair specifically responded to Waters' memorandum both in writing and during an in-person meeting, and neither accepted Waters' request for a transfer. (R. 56.1 ¶¶ 126–30.)

On July 11, 2008, Waters met with Choi, Nair, and Montgomery regarding her adherence to the Performance Improvement/Developmental Plan. (R. 56.1 ¶ 133.) At the meeting, Waters was informed that her work product had improved but that she needed to rectify her interactions with colleagues and supervisors. (R. 56.1 ¶ 134.) Waters again disputed her supervisors' assessment and stated that their comments were "totally false" and that her conduct was "always professional." (R. 56.1 ¶¶ 136–38.)

Fifth, during the same time period, Waters had a dispute with her supervisors regarding a personal day that she requested. Specifically, on May 29, 2008, Waters was notified that CIM would convene a required two-day meeting on August 7 and August 8, 2008. (R. 56.1 ¶ 139.) On July 2, 2008, Waters submitted a request for a personal day on August 8, 2008 and explained that she had a court appearance on that date. (R. 56.1 ¶ 140.) Upon receiving the request, Choi informed Waters that she should support her request with documentation and provided Waters with an opportunity to do so. (R. 56.1 ¶ 141.) However, Waters failed to corroborate her request and Choi rejected Waters' application. Choi further explained that if Waters failed to attend the meeting, it would be viewed as insubordination. (R. 56.1 ¶¶ 142–45.)

On August 7, 2008, Waters attended the first day of the two-day meeting. During the meeting, Waters informed Nair that she would not attend the session the following day. (R. 56.1 ¶¶ 146–47.) The next morning, Waters placed a telephone call to GBGM's Human Resources department and stated that she needed to take an emergency personal day.[7] (R. 56.1 ¶ 148.)

On August 11, 2008, Waters met with her supervisors to discuss her failure to attend the August 8, 2008 meeting. (R. 56.1 ¶ 151.) At the meeting, Waters was provided with another opportunity to submit documentation supporting her need to miss the mandatory meeting. However, Waters again declined to do so. (R. 56.1 ¶¶ 152–53.) As a result, GBGM suspended Waters for two days without pay. The suspension was upheld after Waters refused, for a third time, to corroborate her need to miss the meeting. (R. 56.1 ¶¶ 154–56.)

---

7. Pursuant to GBGM's Personal Day Policy, a GBGM employee must receive written approval from a direct supervisor at least 24 hours in advance of a personal day. (R. 56.1 ¶ 149.)

### III. Procedural History

On August 7, 2008, Waters filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that GBGM has discriminated against her on the basis of disability, race, color, sex, and age. Thereafter, Waters amended her charge to include allegations about her two-day suspension. (R. 56.1 ¶¶ 157–58.) On April 29, 2009, the EEOC issued a Dismissal and Notice of Rights letter that informed Waters that "the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (Williams Decl. Ex. I.) The EEOC further reasoned:

[t]here is no dispute that you were given a written warning dated June 9, 2008, but the evidence showed that your supervisors had developed concerns with your poor job performance prior to said date and had documented their concerns to include your poor behavior at work, acts of insubordination, and lack of professionalism.... As unfair as it may have been to you, [GBGM's] decision to give you a written warning dated June 9, 2008 was not motivated by your Age, Sex, Race, [or] Color. There is also no dispute that you were suspended by [GBGM] for two days in August of 2008; however the evidence showed that you were well informed by [GBGM] regarding a mandatory meeting on August 7, 2008 and August 8, 2008 in May of 2008.... [GBGM's] decision to suspend you was based on legitimate, non-discriminatory reasons. There is nothing to suggest that the adverse employment actions you were subjected to by [GBGM] were causally connected to your participation in a legally protected activity that is enforced by the EEOC. Likewise, there is no evidence that you were subjected any conduct because of your Age, Sex, Race, [or] Color that were so severe and pervasive, which had the intent and purpose of altering your working environment as required to meet the definition of hostile work environment.

(Williams Decl. Ex. I.)

On August 17, 2009, Waters filed a *pro se* complaint alleging that GBGM had discriminated against her on the basis on the basis of her race, color, sex, and age, harassed her for the same reasons, and retaliated against her. After retaining counsel, Waters filed an amended complaint on December 30, 2009. In her amended complaint, Waters alleges that GBGM discriminated against her and harassed her because of her age. Following discovery, GBGM moved for summary judgment.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see also Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

On a motion for summary judgment, the initial burden rests with the moving party to make a prima facie showing that no issues of material fact exist for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330–

31, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this showing is made, "[t]o defeat summary judgment, the non-movant must produce specific facts" to rebut the movant's showing and to establish that there are material issues of fact requiring trial. *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir.1998) (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548). In determining whether a genuine issue of material fact exists, a court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir.2010).

■ "Because direct evidence of an employer's discriminatory intent will rarely be found," motions for summary judgment in employment discrimination actions should be evaluated with caution. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). "However, even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *See id.* (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985)). Indeed, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

## II. Hostile Work Environment
### A. ADEA Claim

■ Under the ADEA, a hostile work environment is one in which "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment." *Kassner v. 2nd Ave. Deli. Inc.*, 496 F.3d 229, 240 (2d Cir. 2007) (quoting *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999)). A hostile work environment claim requires a showing that; (1) the plaintiff was subjected to harassment, based on her age, that was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment"; and (2) "that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir.2002) (internal citation omitted).

■ To be "severe or pervasive," Waters must show that GBGM's conduct: (1) was "objectively severe or pervasive—that is, ... create[d] an environment that a reasonable person would find hostile or abusive"; (2) created an environment that Waters "subjectively perceive[d] as hostile or abusive"; and (3) was on account of Waters' age. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir.2007) (citing *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001)); *see also Stofsky v. Pawling Cent. Sch. Dist.*, 635 F.Supp.2d 272, 292 (S.D.N.Y.2009). Objective severity is assessed based on a "totality of the circumstances," which may include: (1) frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *See Patane*, 508 F.3d at 113 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

■ The parties agree that Waters' claims for discrimination and harassment are based on seven events or series of occurrences. (R. 56.1 ¶ 169.) As detailed below, none of the events—alone or in combination—provide a basis for concluding that there was an objectively hostile work environment or that GBGM harassed Waters because of her age.

### 1. Assignment of a "Menial" Clean-up Task

First, Waters contends that Whiteside assigned her a "menial" cleaning and filing task. However, there is little support for the proposition that a reasonable person would find this objectively hostile or abusive. Moreover, Waters has adduced no evidence that Whiteside assigned this task to Waters on account of her age and, in fact, Whiteside was at least 50 years old at the time she assigned the task to Waters.

As many courts have recognized, where the plaintiff and the individual whose conduct is at issue are members of the same protected class, the inference that the conduct constitutes harassment or discrimination is weakened. *See, e.g., Boston v. Macfadden Publ'g, Inc.*, No. 09 Civ. 457(RJH), 2010 WL 3785541, at *11 (S.D.N.Y. Sept. 29, 2010) ("[T]he decision makers[ ] were well within the protected class at 66 years of age at the time of termination, weakening any inference of discrimination that could be drawn in this case."); *Adams v. Canon USA, Inc.*, No. 07 Civ. 3512(DRH), 2009 WL 3064856, at *14 (E.D.N.Y. Sept. 22, 2009) ("The fact that the decisionmaker is a member of Plaintiff's protected class not only weakens any suggestion of discrimination but strongly suggest[s] that invidious discrimination is unlikely.") (internal quotations omitted); *Mathews v. Atria Huntington*, 499 F.Supp.2d 258, 267 (E.D.N.Y.2007) ("[T]he fact that ... the decisionmakers with regard to plaintiff's firing[ ] were forty-five and fifty-six years old, respectively, weakens any inference that the decision to fire plaintiff was based on his age."); *Zuffante v. Elderplan, Inc.*, No. 02 Civ. 3250(WHP), 2004 WL 744858, at *6 (S.D.N.Y. Mar. 31, 2004) (reasoning that "invidious discrimination" is unlikely "when the person who made the termination decision is in the same protected class as plaintiff").

Waters also contends that she was transferred to a lower-level position when she questioned this work assignment. However, the undisputed evidence shows that: in 2007, GBGM restructured due to legitimate business needs; Waters' position was eliminated as a result of the restructuring; GBGM presented Waters with various alternatives, which included two positions within GBGM; Waters opted to transfer to a new position; and Waters suffered no reduction in salary, benefits, or seniority as a result of this transfer.

As a threshold matter, the July 2007 transfer was voluntary. Moreover, there is simply no evidence that the transfer—or GBGM's decision to provide Waters with various alternatives after her prior position was consolidated with another position—was objectively abusive or hostile or that it was on account of Waters' age. Rather, the transfer was the result of a legitimate business decision by GBGM and we are loathe to second guess such a decision. *See, e.g., Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir.1989) (noting that federal courts do not have a "roving commission to review business judgments"); *Foxworth v. Am. Bible Soc'y*, No. 03 Civ. 3005(MBM), 2005 WL 1837504, at *7 (S.D.N.Y. July 28, 2005) ("Businesses routinely make decisions about the appropriate allocation, or reallocation, of their resources, expanding some enterprises while reducing others, and such business judgments do not invariably provide evidence of discriminatory intent."); *Fitzpatrick v. N.Y. Cornell Hosp.*, No. 00 Civ. 8594(LAP), 2003 WL 102853, at *6 (S.D.N.Y. Jan. 9, 2003) ("The laws prohibiting discrimination in employment were not intended to transform the courts into personnel managers.... [District courts] must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making pro-

cess.") (internal citations and quotations omitted).

Thus, we cannot conclude that this alleged conduct was objectively hostile or was on account of Waters' age.

### 2. Cancelled Vacation Requests

Next, Waters contends that McKie frequently cancelled her vacation requests. However, during discovery, Waters conceded that she in fact took vacation during the relevant time period, that she does not know how many vacation requests McKie cancelled, and now simply contends that McKie directed Choi to cancel one of Waters' vacation requests. As a threshold matter, Waters' argument that McKie directed Choi to cancel a vacation request is unsupported by the evidence. Additionally, even assuming that a single vacation request were cancelled, Waters does not argue that a reasonable person would find this abusive or hostile.

Nor is there any evidence that such a cancellation, if it occurred, was on account of Waters' age. Like Whiteside, McKie was approximately 54 years old during the relevant time period. Because McKie was part of the same protected class as Waters, common sense dictates that any plausible inference of age-based harassment is weakened.

Accordingly, we have no basis to conclude that the cancellation occurred, that it could be deemed objectively hostile, or that that the cancellation was based on Waters' age.

### 3. Punishment for Missing Meetings

Waters also contends that she was punished for missing staff meetings when she opted to attend computer refresher courses or Staff Association meetings. However, Waters fails to point to any evidence of punishment and does not articulate how any such punishment was on account of her age. We agree with GBGM that such a generalized, unsupported grievance will not permit Waters to withstand summary judgment. *See Garcia v. Henry St. Settlement,* 501 F.Supp.2d 531, 541 (S.D.N.Y.2007) ("Speculation, conjecture and guess-work cannot substitute for actual evidence ..."); *Williams v. Alliance Nat'l Inc.,* No. 98 Civ. 7984(RCC), 2001 WL 274107, at *5 (S.D.N.Y. Mar. 19, 2001) ("[Plaintiff's] beliefs cannot replace the "admissible evidence" required to permit an inference of discrimination and survive summary judgment."); *Agugliaro v. Brooks Bros., Inc.,* 927 F.Supp. 741, 748 (S.D.N.Y.1996) ("[I]t was incumbent upon plaintiff to present 'specific facts'—not conclusory allegations, speculations, surmise, or 'feelings'—to show the existence of genuine issues for trial.").

In light of the wholesale lack of evidence, we cannot conclude that the alleged conduct occurred or that it was objectively hostile.

### 4. Isolation from Co–Workers

Waters further contends that McKie isolated Waters from her co-workers and deprived her of opportunities to attend office social functions. Here too, there is no evidence to support Waters'. argument. Indeed, the only relevant evidence demonstrates that McKie sent an e-mail to Waters in which McKie explicitly encouraged Waters to attend the CIM holiday party.

Thus, absent admissible evidence, we have no basis to conclude that such isolation occurred or that, even if such isolation occurred, it was objectively hostile or precipitated by Waters' age.

### 5. Placement on a Performance Improvement Plan

Next, Waters contends that GBGM harassed her by placing her on a performance plan in June 2008. However, it is far from clear that such a plan could be perceived as objectively hostile or abusive. Moreover, Waters has not articulated a

reasonable argument that GBGM issued this performance plan because of her age.[8] Rather, the evidence supports GBGM's argument that it issued this performance plan only after Waters exhibited a well-documented pattern of poor behavior at work and acts of insubordination. *See Divers v. Metro. Jewish Health Sys.*, No. 06 Civ. 6704(RRM)(JMA), 2009 WL 103703, at *15 (E.D.N.Y. Jan. 14, 2009) ("While the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred[,] they must occur under circumstances in which the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition.") (internal quotations and citations omitted).

Thus, we cannot conclude that the performance plan was either objectively hostile or based on Waters' age.

### 6. Referral to Employee Assistance Program

Waters also contends that she was harassed when GBGM referred her to EAP following the June 10, 2008 meeting. According to Waters, she only attended these EAP therapy sessions because GBGM threatened to terminate her if she failed to attend. The record is again devoid of evidence supporting Waters' contention. Rather, there is a notable amount of contemporaneous documentation regarding Waters' insubordinate and unprofessional conduct prior to and during the June 10, 2008 meeting. Indeed, Robinson, GBGM's Human Resources Director, referred Waters to EAP as a result of the behavior exhibited by Waters during that meeting. Moreover, Robinson, then 65 years of age,

was in the same protected class as Waters, weakening any inference that the referral constituted age-based harassment.

Thus, this conduct falls far short establishing an objectively hostile work environment.

### 7. Two–Day Suspension Without Pay

Finally, Waters argues that she was subjected to a hostile work environment based on her age when GBGM imposed a two-day suspension in August 2008. Yet again, Waters fails to support her argument that the suspension was based on her age. Rather, the evidence supports GBGM's argument that Waters was suspended as a result of her continued insubordination and her repeated failure to comply with GBGM policies.

In sum, Waters has failed to identify any evidence supporting her claim that the above-mentioned incidents created an environment that a reasonable person would find hostile or abusive. Moreover, Waters has failed to support her claims that these incidents occurred because of Waters' age. Indeed, the evidence clearly demonstrates that GBGM took action in response to valid and well-documented concerns about Waters' work product, demeanor, and willful non-compliance with GBGM policies. Accordingly, we grant summary judgment for GBGM on Waters' ADEA hostile work environment claim.

### B. State and Local Claims

■ It is well settled that the legal standards that apply to a hostile work environment claim under the New York State Human Rights Law ("NYSHRL") are the same as those applied under the ADEA

---

**8.** As noted above, Waters was provided with the performance plan at the June 10, 2008 meeting. That meeting was attended by two of Waters' supervisors—Choi and Nair—and two Human Resources personnel—Montgomery and Williams. At the time, Nair was

approximately 56 years old, Montgomery was approximately 68 years old, and Choi and Williams were each in their 30s. Because two of the four decision-makers were in the same protected class as Waters, any inference of discrimination may be undermined.

and Title VII. *See, e.g., Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 610 (2d Cir. 2006) (hostile work environment and retaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII); *Tanvir v. N.Y. State Dep't of Banking*, 123 Fed. Appx. 23, 23–24 (2d Cir.2005) (analyzing Title VII, ADEA, and New York state law claims in tandem). Thus, for the reasons discussed above, we grant summary judgment for GBGM on Waters' hostile work environment claim under the NYSHRL.

■ To establish a hostile work environment claim under the New York City Human Rights Law ("NYCHRL"), a plaintiff need only show that she has been treated "less well" because of her age or other protected class. *See Fenn v. Verizon Commc'ns, Inc.*, No. 08 Civ. 2348(PGG), 2010 WL 908918, at *10 (S.D.N.Y. Mar.15, 2010) (citing *Williams v. NYCHA*, 61 A.D.3d 62, 78, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)); *Kaur v. New York City Health & Hosps. Corp.*, 688 F.Supp.2d 317, 339–40 (S.D.N.Y.2010). Despite the more limited burden, the record is devoid of support for the conclusion that Waters was treated "less well" because of her age. Accordingly, we grant summary judgment for GBGM on Waters' hostile work environment claim under the NYCHRL.

## III. Discrimination
### A. ADEA Claim

■ Under the ADEA, it is "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To establish a prima facie case of employment discrimination under the ADEA, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also James v. N.Y. Racing Ass'n*, 233 F.3d 149, 153–54 (2d Cir.2000).[9]

■ If the plaintiff establishes a prima facie case of employment discrimination, the burden of production then shifts to the defendant to offer legitimate, nondiscriminatory rationale for its actions. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817. After the defendant articulates a legitimate reason for the action, the plaintiff must demonstrate that the proffered reason is pretextual. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To meet this burden, the plaintiff must demonstrate that: (1) the preferred reasons are false; and (2) the real reason was unlawful discrimination. *See Kerzer v. Kingly Mfg.*,

---

9. In 2009, the Supreme Court of the United States questioned whether this burden-shifting framework applies to ADEA claims. *See Gross v. FBL Fin. Servs., Inc.*, — U.S. —, 129 S.Ct. 2343, 2349, 174 L.Ed.2d 119 (2009) ("[T]he Court has not definitively decided whether the evidentiary framework of [*McDonnell Douglas*] utilized in Title VII cases is appropriate in the ADEA context.") (internal citations omitted). However, the Second Circuit has consistently applied *McDonnell Douglas* to ADEA claims, and has continued to do so after the Supreme Court's decision in *Gross. See Holowecki v. Fed. Express Corp.*, 382 Fed.Appx. 42, 45 n. 2 (2010) ("Unless and until the Supreme Court instructs us to do otherwise, we will continue to apply *McDonnell Douglas* to claims arising under the ADEA."). Based on the Second Circuit's clear instructions, we apply the burden-shifting framework.

156 F.3d 396, 401 (2d Cir.1998). Ultimately, "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action." *Gross*, 129 S.Ct. at 2352.

GBGM argues that Waters cannot establish a prima facie case of employment discrimination and that Waters cannot carry her ultimate burden of proving that age was the "but for" cause of the adverse employment action. We agree.

■ GBGM does not contest that Waters was a member of a protected class. However, GBGM argues, *inter alia*, that Waters fails to show that she suffered an adverse employment action. To allege an adverse employment action, a plaintiff must demonstrate that she was subjected to a "materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000). Examples of materially adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir.2004) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003)).

■ Six of the seven events about which Waters complains simply do not constitute adverse employment actions. Specifically, the assignment of a filing task to Waters and her voluntary decision to transfer positions do not reach the level of a materially adverse action. Likewise, the issuance of a performance plan and the recommendation that Waters attend EAP counseling sessions do not constitute adverse employment actions. *See, e.g., Weeks v. N.Y. State Div. of Parole*, 273 F.3d 76, 86 (2d Cir.2001) ("It hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."); *Robins v. New York City Bd. of Educ.*, No. 07 Civ. 3599(JGK), 2010 WL 2507047, at *7 (S.D.N.Y. June 21, 2010) ("The plaintiff did not experience an adverse employment action concerning her two unsatisfactory annual evaluations, her receiving unsatisfactory classroom observations, or her receiving criticism of her performance by Principal Phillips and Assistant Principal Anthony Tamalonis."). Finally, as discussed above, the record is devoid of evidence that GBGM cancelled Waters' vacation requests, isolated Waters from her co-workers, or punished her for missing meetings. Thus, we have no basis to conclude that this conduct occurred or that, even it if had occurred, the conduct would rise to the level of materially adverse employment action.

It is undisputed that Waters was suspended for two days in August 2008 without pay, which would satisfy one element of Waters' prima facie case. However, Waters fails to offer any evidence that the suspension occurred under circumstances giving rise to an inference of discrimination. Of note, Waters does not allege that any statements were ever made about her age, she does not offer evidence that any similarly-situated employees were treated differently than she, and the majority of the supervisors who were involved in imposing the suspension—including Montgomery, Robinson, and Nair—were more than 50 years old.

■ Additionally, assuming Waters were able to establish a prima facie case, GBGM had legitimate, non-discriminatory reasons for suspending Waters—namely, Waters' repeated failure to comply with GBGM policies. *See Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir.2000) (affirm-

ing order granting defendants' motion for summary judgment and reasoning that plaintiff's difficulty following instructions, outright insubordination, and inept performance were legitimate reasons for plaintiff's discharge).

Moreover, Waters has failed to identify a single piece of evidence that could support either: (1) an argument that GBGM's asserted reasoning for suspending Waters was pretextual; or (2) an argument that age was the "but for" cause of Waters' suspension. Thus, because Waters cannot cite to anything beyond her own conclusory assertions and general feelings that GBGM discriminated against her, her discrimination claims cannot survive a motion for summary judgment. *See, e.g., Holowecki v. Fed. Express Corp.*, 382 Fed.Appx. 42, 45–46 (2d Cir.2010) ("Holowecki was discharged after a co-worker complained that he had called her various vulgar names. Although Holowecki denies the co-worker's accusation, multiple witnesses corroborated her account. The undisputed evidence, therefore, establishes that FedEx had a legitimate reason to fire Holowecki."); *Sklar v. N.Y. Life Ins. Co.*, 34 Fed.Appx. 403, 405 (2d Cir.2002) ("Sklar can point to no evidence that the reasons

given for his termination were pretextual or that, even if pretextual, those reasons served as a mask for age discrimination. Therefore, summary judgment was properly awarded."); *Schnabel*, 232 F.3d at 88 ("[B]eyond the minimal proof required to state a prima facie case, Schnabel has offered no evidence that he was discriminated against *because of his age*.") (emphasis in original).

Accordingly, we grant GBGM's motion for summary judgment on Waters' ADEA discrimination claim.

### B. State and Local Claims

■ Because we may analyze ADEA claims and the New York state and local age discrimination claims in tandem, the analysis above applies with equal force to Waters' state and local claims. *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir.2010); *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 n. 1 (2d Cir.2009) ("Age discrimination claims brought pursuant to the NYSHRL and the NYCHRL are analyzed under the ADEA framework . . .") (internal citations omitted).[10] Accordingly, for the reasons stated above, we grant summary judgment for GBGM on Waters' discrimination claims under the NYSHRL and the NYCHRL.[11]

---

**10.** The Second Circuit has not yet addressed whether a plaintiff alleging age discrimination under the NYSHRL or the NYCHRL must establish "but for" causation consistent with the Supreme Court's decision in *Gross. See Saenger v. Montefiore Med. Ctr.*, 706 F.Supp.2d 494, 505 (S.D.N.Y.2010); *Alleva v. N.Y. City Dep't of Investigation*, 696 F.Supp.2d 273, 285 (E.D.N.Y.2010); *Weiss v. JPMorgan Chase & Co.*, No. 06 Civ. 4402(DLC), 2010 WL 114248, at *2 (S.D.N.Y. Jan. 13, 2010). Although courts in this circuit have decided "there is no reason to jettison the burden-shifting framework for NYSHRL and NYCHRL claims," *Saenger*, 706 F.Supp.2d at 507 n. 6, the Second Circuit has not specifically addressed whether a plaintiff alleging violations of the NYSHRL and the NYCHRL must prove: (1) that age was the "but for" cause of the challenged adverse

employment action; or (2) the defendant's employment decision was more likely than not based in whole or in part on discrimination. *Id.* at 507 (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). However, we need not address which standard applies because Waters' claim fails under either standard. A reasonable jury could not conclude that age was more likely than not the basis of GBGM's decision to suspend Waters, and could certainly not conclude that age was the "but for" cause of that suspension.

**11.** We note that that GBGM has urged us to dismiss all of Waters' claims because of procedural defects in her opposition papers, which consist of two documents: a Local Rule 56.1 Counterstatement and a seven-page affidavit from Waters that neither refers to

## CONCLUSION

For the foregoing reasons, GBGM's motion for summary judgment (docket no. 14) is granted. The Clerk of the Court is directed to terminate this motion and to close this case.

nor attaches supporting documents. Specifically, GBGM argues that its motion should be granted because: (1) Waters failed to file a memorandum of law, in violation of Local Rule 7.1(a); (2) Waters has, as a result, abandoned her arguments; (3) Waters' Local Rule 56.1 Counterstatement lacks citations to admissible evidence, in violation of Local Rule 56.1(d); and (4) the affidavit from Waters merely repeats allegations in her pleadings, in violation of Rule 56(e)(2) of the Federal Rules of Civil Procedure.

We decline to rule on these arguments because it is apparent that Waters cannot withstand GBGM's motion for summary judgment for the reasons discussed herein. However, Waters' half-hearted effort to prosecute her claims and to oppose this motion forced GBGM and this Court to engage in a bout of shadow-boxing. This is plainly not a reasonable litigation tactic nor does it result in an efficient use of judicial resources.

As discussed above, this is not the first claim that Waters has filed. Thus, although we have decided against awarding sanctions in this case, we do wish to caution plaintiff and her counsel against bringing future cases as lacking in substance as this one.